UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

In re                                                    :
                                                         :
    S.W. BACH & COMPANY,                                 :
                                                         :
                            Debtor.                      :

--------------------------------------------------------------x
                                                         :
ALBERT TOGUT, as Chapter 7 Trustee of                    :
S.W. BACH & COMPANY,                                     :
                            Plaintiff,                   :
                                                         :
    v.                                                   :
                                                         :
RBC DAIN CORRESPONDENT SERVICES,                         :
A DIVISION OF RBC DAIN RAUSCHER INC.,                    :
RBC CAPITAL MARKETS CORPORATION                          :
(f/k/a RBC DAIN RAUSCHER, INC.),                         :
ANDREW GARRETT, INC., SCOTT SHAPIRO                      :
and JAS MANAGEMENT                                       :
                                                         :
                            Defendants.                  :
--------------------------------------------------------------x

**FOR PUBLICATION**

Chapter 7
Case No. 07-11569 (MG)

Adv. Proc. No. 09-01278 (MG)

**OPINION AND ORDER DENYING DEFENDANT ANDREW GARRETT INC.'S
MOTION TO STAY PROCEEDINGS PENDING ARBITRATION**

*A P P E A R A N C E S:*

TOGUT, SEGAL & SEGAL LLP
*Attorneys for Albert Togut, Chapter 7 Trustee*
One Penn Plaza, Suite 3335
New York, NY 10119
By:    Steven S. Flores, Esq.

LAW OFFICES OF JOSEPH M. HEPPT
*Attorneys for Defendant Andrew Garrett, Inc.*
260 Madison Avenue, 21st Floor
New York, NY 10016
By:    Joseph M. Heppt, Esq.

**MARTIN GLENN**
**United States Bankruptcy Judge**

Pending before the Court is the motion to stay this adversary proceeding commenced by

Albert Togut, the chapter 7 trustee ("Trustee" or "Togut") of the debtor, S.W. Bach & Co.

("S.W. Bach" or "Debtor"). Defendant Andrew Garrett, Inc. ("AGI") moved to stay the

adversary proceeding with respect to Count 9 of the Complaint (Bankruptcy Code § 548

fraudulent conveyance claim), and to compel arbitration of Counts 8 (aiding and abetting breach

of fiduciary duty by defendant Scott Shapiro ("Shapiro")) and 10 (restitution and unjust

enrichment). ("AGI Stay Mot.," ECF # 39.)[1] The Trustee argues that Counts 8 and 10 are within

the Court's core jurisdiction and those claims (along with Count 9) should be adjudicated in this

Court. For the reasons explained below, the Court declines to stay Count 9, the fraudulent

conveyance claim. The Court concludes that Counts 8 and 10 are state law claims that the

Trustee brings standing in the shoes of the Debtor; those claims are subject to mandatory

arbitration and will not be adjudicated by the Court. Nevertheless, the Court concludes that

Count 9, the fraudulent conveyance claim, arises from common issues of fact with the state law

claims, and does not arise from or depend upon the resolution of the state law claims. The strong

interest of the Trustee and the estate to assure a federal forum for the resolution of the federal

---

[1] Originally, there were two motions filed to stay the adversary proceeding pending two separate arbitrations. One motion was filed by defendants RBC Dain Correspondent Services and RBC Capital Markets Corporation (together, "RBC Dain"), and one was filed by defendant AGI. The Trustee and RBC Dain have reached an agreement in principle to settle the adversary proceeding. A Rule 9019 motion to approve the settlement is on the calendar for presentment for March 15, 2010. (ECF # 100.). RBC Dain has withdrawn its motion to stay the action and compel arbitration without prejudice pending consideration of approval of the proposed settlement. Because the claims against AGI relate to alleged conduct of RBC Dain and defendant Shapiro, this opinion describes the allegations concerning RBC Dain and Shapiro to the extent relevant to the claims against AGI. Shapiro has answered the Complaint; he has not moved to compel arbitration. Another entity, JAS Management, Inc. ("JAS Management"), was also a defendant in this case, but its answer has been stricken and a default judgment entered against it. (ECF # 91.) This opinion deals only with AGI's motion. References to facts relating to RBC Dain and Shapiro are taken from the Complaint and do not constitute findings of fact by the Court; the defendants filed answers denying the material allegations of the Complaint.

statutory fraudulent conveyance claim supports the issuance of a stay of the arbitration pursuant to 11 U.S.C. § 105 pending this Court's disposition of the fraudulent conveyance claim. Otherwise, there is a risk of inconsistent results and arguments about claim preclusion.

## BACKGROUND[2]

### A.    The Parties

Debtor, a Georgia corporation, is a broker-dealer that provided, among other things, investment advice to customer account holders in exchange for advisory fees. (Compl. ¶¶ 44, 59.) From at least 2001, Shapiro was President of the Debtor. (Compl. ¶ 46.) JAS Management is the sole shareholder of the Debtor. The Debtor ceased operations in or about February 2007. (Compl. ¶ 60.) On May 22, 2007, creditors of the Debtor filed an involuntary petition for relief against the Debtor in this Court under chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (Compl. ¶ 1.) The Court entered an Order for relief on June 29, 2007 and Togut was appointed as the Trustee.

Prior to the Debtor's cessation of operations, the Debtor managed approximately 15,000 customer accounts ("Accounts"). (Compl. ¶ 61.) Togut contends that the right to manage and to earn fees from the Accounts is the Debtor's largest asset. (Compl. ¶ 10.) RBC served as the clearing firm for the Accounts, providing various services to the Debtor including cashiering services, bookkeeping, custodial services and the distribution of dividends to customers of the Debtor. (Compl. ¶ 66.) RBC provided clearing services to the Debtor pursuant to the terms of a clearing agreement executed on or about June 14, 2006 ("Clearing Agreement"). (Compl. ¶ 67.)

---

[2]    The Court takes the facts from the Complaint and certain documents submitted by the parties. The Background discussion does not reflect any factual findings, and recognizes that AGI (and other defendants) denied certain factual allegations cited herein.

Defendant AGI is a national broker-dealer offering, among other things, private investment management services and investment banking services.  (Compl. ¶ 55.)  AGI and RBC have had a business relationship since at least 2001.  (Compl. ¶ 82.)  AGI and the Debtor were member firms of NASD.[3]  (*See* AGI Stay Mot. ¶ 1; Declaration of Stephen S. Flores, Esq., dated December 15, 2009 (ECF # 70) ("Flores Dec."), Ex. B).  While members of NASD, AGI and the Debtor were subject to FINRA's Rule 13200, by its terms applicable to all claims filed after April 16, 2007.  (AGI Stay Mot. ¶ 1; Dec. of Joseph M. Heppt, dated October 13, 2009 (ECF # 39) ("Heppt October Dec."), Ex. C.)

FINRA Rule 13200 provides, in relevant part:

> (a) Generally
>
> Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons.[4]

(Heppt October Dec., Ex. C.)

According to the Complaint, with RBC's direction, assistance and involvement, Shapiro caused the Debtor to transfer all, or nearly all, of the Accounts to AGI, for which the Debtor received no consideration.  (*See* Compl. ¶ 74.)  The Trustee alleges this occurred because RBC's

---

[3]    The Debtor and AGI disagree whether the Debtor retained the ability to transfer the accounts following its tender of a Financial Industry Regulatory Authority ("FINRA") Form BDW (Uniform Request for Broker-Dealer Withdrawal) ("BDW Form") on February 23, 2007.  (*See* Supplemental Mem. Supp. Trustee's Objection Mot. AGI Stay Proceedings Pending Arbitration, ¶¶ 5-20 (ECF # 70); Supplemental Br. Supp. Mot. AGI Stay Proceedings Pending Arbitration, ¶¶ 2-9 (ECF # 71).)  However, without making any factual findings, the Court assumes that the Debtor's membership in NASD concluded on April 24, 2007, the date indicated as the date registration status was "terminated" on the Debtor's FINRA Registration Status History.  (Flores Dec., Ex. 5.)  FINRA Rule 13100 defines "member" as "any broker or dealer admitted to membership in FINRA, whether or not the membership has been terminated or cancelled."  (AGI's Answer, 33.)

[4]    AGI contends that defendant Shapiro is also an "Associated Person" registered with the NASD.  However, Shapiro has not sought to arbitrate the claims asserted against him.  The Court does not decide whether any of the claims against Shapiro are arbitrable.

4

president, Craig Gordon ("Gordon"), became aware of the S.W. Bach's financial distress and

wanted RBC to continue earning fees from the Accounts, which could only be accomplished if

RBC or Gordon could convince Shapiro to transfer the Accounts to a current RBC customer such

as AGI. (Compl. ¶¶ 89, 91.) On or about March 2, 2007, AGI notified the Debtor's customers

by letter that their accounts had been transferred to AGI. (Compl. ¶ 118.)

AGI has not filed a Proof of Claim in this case. The Bar Date for non-governmental

claims was April 11, 2008. (Case No. 07-11569, ECF # 36.)

**B. Procedural Background**

Togut filed the Complaint on June 15, 2009. He alleges that the facts support eighteen

causes of action against RBC, Shapiro, JAS and AGI. The claims against AGI are asserted in

Counts 8, 9 and 10, and are summarized below.[5] Because the Trustee alleges that AGI and RBC

Dain aided and abetted a breach of fiduciary duty by Shapiro, the breach of fiduciary duty claim

---

[5]     The Trustee also asserts causes of action for Disallowance of Bankruptcy Claims filed under 11 U.S.C. §
502(d) (Count 17) and Equitable Subordination/Disallowance under11 U.S.C. § 510(c) (Count 18), against all
Defendants, including AGI. However, equitable subordination and recharacterization require filing a proof of claim:
"[i]f a creditor has not filed a claim, there is nothing to subordinate nor any case or controversy to resolve."
*O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Group Ltd.)*, 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008)
(Bernstein, C.J.) ("*Alphastar*"); *Gold v. Winget (In re NM Holdings Co., LLC)*, 407 B.R. 232, 288 (Bankr. E.D.
Mich. 2009) (dismissing equitable subordination and disallowance claims against defendants who did not file proofs
of claim, because "there is no debt to recharacterize and no claim to subordinate"). Accordingly, because AGI has
not filed a proof of claim, Counts 17 and 18 cannot apply to AGI. Notably, AGI did not reference Counts 17 and 18
in its motion papers with respect to seeking arbitration or a stay of proceedings in this Court regarding Counts 17
and 18. (*See* AGI Stay Mot. ¶ 2.) Accordingly, the Court does not address the arbitrability or any stay of Counts 17
and 18 in this opinion.
        The Court recognizes that in both *Alphastar* and *In re NM Holdings Co., LLC* the bankruptcy courts also
decided motions to dismiss regarding breach of fiduciary duty claims against Debtor's former officers and directors,
financial advisors, controlling shareholders, the CEO's family members, and/or certain alleged alter ego entities of a
CEO, as well as unjust enrichment claims against certain of the same defendants in *In re NM Holdings Co., LLC*,
outside of the arbitration context, and without determining the claims were core or non-core. *See Alphastar*, 383
B.R. at 267-75; *In re NM Holdings Co., LLC*, 407 B.R. at 243-44. For the reasons explained further *infra*, the *In re
NM Holdings Co., LLC* and *Alphastar* courts had defendants before them with much closer relationships to the
Debtors than AGI here, and, thus, those courts' determinations that they could decide such claims do not change this
Court's determinations that the aiding and abetting breach of fiduciary duty and unjust enrichment/restitution claims
are arbitrable.

against Shapiro (Count 6) and the aiding and abetting breach of fiduciary duty claims against

RBC Dain (Count 7) are summarized as well.

| Count # | Cause of Action | Elements |
|---------|-----------------|----------|
| Count 6 | Breach of Fiduciary Duty against Shapiro | Shapiro allegedly breached a duty to exercise due care and diligence in the management and administration of the affairs of the Debtor and in the use, preservation, or disposition of its assets; fiduciary obligations of loyalty and candor, including a requirement that he exercise control of the Debtor in a fair, just and equitable manner and to act in the best interests of the Debtor. Shapiro allegedly breached his duties by (1) failing to pursue a competitive bidding process for the Accounts; (2) failing to commission a proper valuation of the Accounts (including the right to manage them) to determine an appropriate sales price; (3) acting out of self interest and to enhance his reputation by using the Accounts to try to obtain future employment for himself, rather than maximizing return for the Debtor; (4) failing to reasonably investigate or learn material facts before causing the Debtor to transfer the Accounts; (5) failing to ensure a reasonable, prudent, orderly and/or equitable transfer of the Accounts; and (6) essentially surrendering the selection-process relating to the transfer of the accounts to RBC Dain thereby wasting a valuable corporate asset in the process, improper actions which were allegedly motivated by Shapiro's desire to further his own pecuniary interests and were outside the scope of his agency relationship with the Debtor. (Compl. ¶¶ 191-92, 196-98.) |
| Count 7 | Aiding and Abetting Shapiro's Breach of Fiduciary Duties against RBC | RBC allegedly knowingly provided substantial assistance to Shapiro in breaching his fiduciary duties to the Debtor. RBC allegedly (i) hand-picked AGI to be the next manager of the Accounts, (ii) told Shapiro to transfer the Accounts to AGI in the manner described in the Complaint, (iii) encouraged the disloyal acts of Shapiro, (iv) negotiated with AGI t to facilitate the transfer of the accounts, and (v) provided the direct assistance, including the personnel and technology and know-how necessary to complete the transfer of the accounts, and misled Shapiro into thinking it would not charge a Termination Fee in connection with the transfer of the accounts. (Compl. ¶¶ 203-04.) |
| Count 8 | Aiding and Abetting Liability against AGI | AGI allegedly knowingly provided substantial assistance to Shapiro in breaching his fiduciary duties to the Debtor, including by: (i) inducing Shapiro to transfer the Accounts with the false promise of compensation and future employment, (ii) assisting with the transfer of the accounts; and (iii) accepting the transfer of the accounts under the circumstances described in the Complaint. |

6

| | | (Compl. ¶ 210.) |
|---|---|---|
| Count 9 | Avoidance and Recovery of Fraudulent Transfers to AGI | The Debtor allegedly transferred the Accounts to AGI within two years of the Petition Date, for AGI's benefit. The Debtor was (i) insolvent on the date the accounts were transferred, or became insolvent as a result of the transfer; and/or (ii) engaged in business or a transaction for which any property remaining with the Debtor was an unreasonably small capital at the time of, or a result of, the transfer of the accounts. (Compl. ¶¶ 214, 217.) |
| Count 10 | Restitution and Unjust Enrichment against AGI | AGI allegedly obtained the Debtor's right to manage the Accounts prior to the Petition Date, for which the Debtor received no consideration, and, as a result of which, AGI has earned substantial profits/fees, and from which AGI should not be permitted to continue profiting without compensating the Debtor and its estate. (Compl. ¶¶ 221-23, 225.) |

All of the defendants answered the Complaint on August 14, 2009. AGI asserted four affirmative defenses in its Answer (ECF # 14): (1) the litigation is not properly maintained under applicable and controlling industry rules; (2) AGI agreed to accept the transfer of the Accounts as part of the regulatory scheme, including SEC Rule 15c3-1, the "Net Capital Rule," and Rule 15c3-3, the "Customer Protection Rule," designed to protect customers of brokerage-firms that cease operations due to financial insolvency; (3) once the Debtor tendered its license to the NASD, it was prohibited from managing the Accounts as a matter of law and, therefore, the right to manage those Accounts was no longer an asset of the firm; (4) the Trustee's damages, if any, were caused by the actions of individuals or entities over whom AGI exerted no control and for whom it bears no responsibility. (AGI Answer, at 33-34.)

AGI filed its motion to stay the adversary proceeding and compel arbitration on October 14, 2009. On November 23, 2009, the Court heard oral argument of AGI's motion. The Court ordered Togut and AGI to submit supplemental briefs by December 15, 2009, which they did.

**DISCUSSION**

**A.    Introduction**

"The Federal Arbitration Act ("FAA"), *see* 9 U.S.C. § 1 *et seq.*, requires a federal court to enforce arbitration agreements and to stay litigation that contravenes them."[6]  *Burns v. New York Life Ins. Co.*, 202 F.3d 616, 620 (2d Cir. 2000) (internal citation omitted); *see also* 9 U.S.C. §§ 2 & 3; *Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 197 (Bankr. S.D.N.Y. 2002) ("*Hagerstown*").[7]  The FAA represents a "congressional declaration of a liberal federal policy favoring arbitration agreements," and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Hagerstown*, 277 B.R. at 197 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).  However, "[l]ike any statutory directive, the [FAA's] mandate may be overridden by a contrary congressional command."  *Id.* at 198 (quoting *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).

Accordingly, a bankruptcy court faced with a motion to compel arbitration must apply a four-part test:

> [F]irst, it must determine whether the parties agree to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

---

[6]    The parties do not appear to dispute that the FAA applies to the parties' obligations under FINRA Rules.

[7]    Section 2 of the FAA provides: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  Section 3 of the FAA provides: "If any suit or proceeding be brought in any of the courts of the United States upon any issues referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

*Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.),* 390 B.R. 784, 789

(Bankr. S.D.N.Y. 2008) ("*Bethlehem Steel*") (quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134

F.3d 72, 75-76 (2d Cir. 1998)).

AGI's motion, while seeking to stay litigation pending completion of the arbitration of

Counts 8 and 10, does not seek to compel arbitration of Count 9, the fraudulent conveyance

claim.

> Avoidance claims are not derivative of the debtor's rights; rather, they are
> statutory claims created in favor of creditors that can only be prosecuted
> by a trustee or debtor in possession . . . .  Claims that are derivative of a
> debtor's rights may be subject to arbitration.  Claims that belong
> exclusively to a trustee or debtor in possession belong to creditors who
> were not parties to the arbitration agreement and, therefore, are not subject
> to arbitration.

*Bethlehem Steel,* 390 B.R. at 791-92.  *See also Hays & Co. v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.,* 885 F.2d 1149, 1154-55 (3d Cir. 1989) ("*Hays*") (internal citations omitted).

Accordingly, the issue here is whether Counts 8 and 10 are subject to mandatory arbitration

under the factors enumerated in *Bethlehem Steel*, and, if so, whether arbitration of those claims

should occur before or after this Court adjudicates the fraudulent conveyance claim.

### B.    Whether the Parties Agreed to Arbitrate

The parties do not dispute that AGI and the Debtor were members of FINRA and that

FINRA Rule 13200 governing mandatory arbitration applies to the Debtor and AGI.  (*See*

Trustee's Objection Mot. AGI Stay Proceedings Pending Arbitration, November 18, 2009; ECF

# 53.)[8]

---

[8]    Even if the Debtor's membership in FINRA for purposes of the applicability of FINRA Rule 13200 was
disputed, FINRA Rule 13100 defines "member" as "any broker or dealer admitted to membership in FINRA,
*whether or not the membership has been terminated or cancelled*."  (AGI's Answer, at 33.) (emphasis in original).
The Debtor's registration status in FINRA was "terminated" as of April 24, 2007.  (Flores Dec., Ex. 5, FINRA
Registration Status History.)  As noted, *supra,* the Debtor and AGI disagree whether the Debtor retained the ability

### C.    The Scope of the Arbitration Agreement

*1.    The Claims are Covered by the Broad Arbitration Provision*

To determine the scope of an arbitration agreement, the Court first examines whether the arbitration clause is "narrow" or "broad," in light of the allegations of the complaint, not the legal theories espoused. *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995); *see also Bethlehem Steel*, 390 B.R. at 789-90; *Hagerstown*, 277 B.R. at 198. The Second Circuit in *Collins & Aikman Products Co.* explained the relevance of the distinction between broad and narrow clauses:

> In construing arbitration clauses, courts have at times distinguished between 'broad' clauses that purport to refer all disputes arising out of a contract to arbitration and 'narrow' clauses that limit arbitration to specific types of disputes. If a court concludes that a clause is a broad one, then it will order arbitration and any subsequent construction *of the contract and of the parties' rights and obligations under it* are within the jurisdiction of the arbitrator.

*Collins & Aikman Prods. Co.*, 58 F.3d at 21 (quoting *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988) (emphasis in original).

In *JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004), the Second Circuit held that a clause submitting to arbitration "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter" was a broad form of clause. (Internal citations omitted). Similarly, in *Mehler v. The Terminix International Co. L.P.*, 205 F.3d 44, 49 (2d Cir. 2000), the Second Circuit determined that a clause referring to arbitration "any controversy or claim between [the parties] arising out of or relating to" an agreement was broad and justified a

---

to transfer the accounts following its tender of a Form BDW on February 23, 2007; however, neither the date of tender of the BDW form nor the date of termination are relevant under FINRA Rule 13100 in determining whether the Debtor was a "member" of FINRA and subject to FINRA Rule 13200. (*See* Supplemental Mem. Supp. Trustee's Objection Mot. AGI Stay Proceedings Pending Arbitration, December 15, 2009 ¶¶ 5-20 (ECF # 70); Supplemental Br. Supp. Mot. AGI Stay Proceedings Pending Arbitration, December 15, 2009, ¶¶ 2-9 (ECF # 71).) *See also* n.3, *supra.*

presumption of arbitrability.  Still, "even with a broad form clause, if the claims present no

questions in respect of the parties' rights and obligations under [the agreements], they are outside

the purview of the arbitration clause and are not arbitrable."  *Bethlehem Steel*, 390 B.R. at 790

(internal quotation marks and citation omitted).

Though not explicitly labeling the NASD Code/FINRA Rules as containing a "broad" or

"narrow" arbitration provision, the court in *McMahan Securities Co. L.P. v. Forum Capital*

*Markets L.P.*, 35 F.3d 82, 88 (2d Cir. 1994), in analyzing whether the plaintiffs' claims were

covered by the NASD code, noted it was "mindful that the federal policy favoring arbitration

requires us to construe arbitration clauses as broadly as possible and that arbitration should be

ordered unless it may be said with positive assurance that the arbitration clause is not susceptible

of an interpretation that covers the asserted dispute."  (Internal quotation marks and citation

omitted).  Accordingly, the Court finds that the language in FINRA Rule 13200, that a dispute is

arbitrable if it "arises out of the business activities of a member" is broad.

2.   *Congress Intended to Exclude Certain of the Disputes from Arbitration*

Even if all the claims for which AGI seeks to compel arbitration were covered by the broad language in FINRA Rule 13200, the Court has discretion to deny arbitration of the claims. *Bethlehem Steel*, 390 B.R. at 793-94.  The Supreme Court has acknowledged that "[l]ike any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command.  The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* (quoting *Shearson/Am. Express, Inc.*, 482 U.S. at 226-27).  The court may deduce the intent "from [the statute's] text or legislative history . . . or from an inherent conflict between arbitration and the statute's underlying purposes." *Shearson/Am. Express, Inc.*, 482 U.S. at 227 (internal quotation marks and citations omitted).

"The issue of waiver predominates arbitration disputes involving bankruptcy claims . . . ." *Hagerstown*, 277 B.R. at 198.  Specifically, "[w]hen arbitration law meets bankruptcy law head on, clashes inevitably develop." *Id.* at 199.  The first indication of waiver is whether a claim is "core" or "non-core."  If a claim is "non-core," the court generally lacks discretion and must refer the claim to arbitration.  *See U.S. Lines, Inc. v. American Steamship Owners Mut. Prot. and Indem. Ass'n, Inc. (In re U.S. Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999) ("*U.S. Lines*"); *Hagerstown*, 277 B.R. at 200 ("[N]otwithstanding the possibility of bifurcated or even trifurcated proceedings, or duplicative proceedings involving multiple parties, a court generally lacks the discretion to refuse to compel the arbitration of non-core claims") (citing *Hays*, 885 F.2d at 1161).

If a claim is core, "the bankruptcy court must still carefully determine whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing the arbitration clause," and the "arbitration clause should be enforced unless [doing so] would

seriously jeopardize the objectives of the Code." *Hagerstown*, 277 B.R. at 200-01 (internal

quotation marks and citations omitted). "Th[is] second step asks whether the underlying dispute

concerns rights created under the Bankruptcy Code or non-Bankruptcy Code issues derivative of

the debtor's pre-petition business activities. In the former situation, the bankruptcy court has

discretion to refuse arbitration, but in the latter it does not." *Id.* at 202 (internal citation omitted).

In order to determine whether a claim is core or non-core, the court considers that:

> [a] trustee in bankruptcy wears two hats. First, he stands in the shoes of
> the debtor, and may bring any suit that the debtor could have brought
> before bankruptcy. When the trustee sues as statutory successor to the
> debtor, his rights are limited to the same extent as the debtor's under
> applicable non-bankruptcy law. If the debtor agreed in a pre-petition
> contract to arbitrate a dispute, the trustee, suing as successor to the debtor,
> is likewise bound by the arbitration clause. Second, under 11 U.S.C. §
> 544, the trustee also stands in the 'overshoes' of the creditors. . . . Section
> 544(b) . . . puts the trustee in the creditors' shoes, and allows him to assert
> claims that only they could assert outside of bankruptcy.

*Id.* at 206-07 (internal citations omitted).

"Core proceedings are matters arising under the Bankruptcy Code or arising in

bankruptcy cases. Non-core proceedings are merely related-to bankruptcy cases." *Cibro*

*Petroleum Prods. v. City of Albany (In re Winimo Realty Corp.)*, 270 B.R. 108, 119 (S.D.N.Y.

2001) ("*Winimo Realty Corp.*") (citing 28 U.S.C. § 157(b) and (c); *Pardo v. Akai Electric Co.*

*Ltd. (In re Singer Co. N.V.)*, No. 00 CIV 6793 LTS, 2001 WL 984678, at \*2 n.5 (S.D.N.Y. Aug.

27, 2001)) (internal quotation marks omitted). Section 157 of Title 28 of the United States Code

sets out a non-exhaustive list of core bankruptcy proceedings, including, *inter alia*, "allowance

or disallowance of claims against the estate" and "counterclaims by the estate against persons

filing claims against the estate." Furthermore, the Second Circuit has noted that "[c]laims that

clearly invoke substantive rights created by federal bankruptcy law necessarily arise under Title

11 and are deemed core proceedings. So too are proceedings that, by their nature, could arise

only in the context of a bankruptcy case." *MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 108-09 (2d Cir. 2009) (internal citations omitted).

In many ways the issue here whether Counts 8 and 10 are core or non-core is made easier because AGI did not file a proof of claim in Debtor's bankruptcy case. When a proof of claim has been filed, a court is often faced with the task of determining whether a trustee's claim is a counterclaim to the proof of claim, rendering the entire dispute a core proceeding. *See Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 285 B.R. 822, 831 (S.D.N.Y. 2002) (*"Iridium Operating"*) (internal citations omitted); *Hagerstown*, 277 B.R. at 203. Such claims are often denominated as "procedurally core." But procedurally core claims may still be subject to mandatory arbitration. The fact that AGI did not file a proof of claim does not automatically mean that Counts 8 and 10 are non-core. Further analysis of the claims is required.

  a. *Procedurally Core Claims*

Procedurally core claims are "garden variety pre-petition contract disputes dubbed core because of how the dispute arises or gets resolved." *Hagerstown*, 277 B.R. at 203 (finding a breach of contract claim as procedurally core). "The arbitration of a procedurally core dispute rarely conflicts with any policy of the Bankruptcy Code unless the resolution of the dispute fundamentally and directly affects a core bankruptcy function." *Id.* (internal citation omitted).

Courts in the Second Circuit have held that traditionally non-core claims against a creditor may turn into core claims after the creditor files a proof of claim since an adversary proceeding against such a creditor "would affect the allowance or disallowance of the creditor's claim*." Iridium Operating*, 285 B.R. at 831; *see also Hagerstown*, 277 B.R. at 203 ("Objections to proofs of claim and counterclaims asserted by the estate . . . exemplify this type of

[procedurally core] matter.").  If an otherwise non-core claim "aris[es] out of the same

transaction as the creditor's proof of claim," or "the adjudication of the claim . . . require[s]

consideration of the issues raised by the proof of claim . . . such that the two are logically

connected," the claim is core.  *Northwest Airlines, Inc. v. City of Los Angeles (In re Northwest

Airlines Corp.)*, 384 B.R. 51, 58 (S.D.N.Y. 2008) (internal quotation marks and citations

omitted) (finding that a claim was non-core because the proofs of claim did not arise out of or

relate to the provisions of leases at issue in the adversary proceeding, but referred to charges for

leases, landings and rejection damages).  In *Bankruptcy Service v. Ernst & Young (In re CBI

Holding Co.)*, 529 F.3d 432, 462, 465 (2d Cir. 2008) (*"CBI Holding"*), the Second Circuit found

that a disbursing agent's negligence, breach of contract and fraud claims filed in response to

defendant's proof of claim derived from the same operative facts as the defendant's proof of

claim and were core under 11 U.S.C. § 157(b)(2).[9]

    Procedurally core claims may still be subject to mandatory arbitration if arbitration of the

claims would not violate any bankruptcy policy.  In *Hagerstown*, for example, Judge Bernstein

found the breach of contract claims to be "procedurally core," because they were "raised as

counterclaims in connection with the trustee's objection to [the creditor's] proof of claim."  The

court nevertheless concluded that it was required to refer the contract claims to arbitration.

*Hagerstown*, 277 B.R. at 205.  The contract claims arose from the parties' prepetition

---

[9]    The *CBI Holding* court also, however, "express[ed] no judgment on the question of when, if ever, a claim
that does not qualify as core under § 157(b)(2)'s express language could be rendered core only on the grounds that it
is based on the same transaction as a core proceeding."  *Id.* at 465 n.19.

contractual relationship, were procedurally core only, and arbitration of the claims would not

interfere with any bankruptcy policy. *Id.*[10]

      *b. Substantively Core Claims*

Conversely, claims that are "not based on the parties' pre-petition relationship, and

involve rights created under the Bankruptcy Code" are core for substantive reasons and are

usually not arbitrable nor subject to a withdrawal of the reference. *See id.* at 203. As Judge

Bernstein noted in *Hagerstown*, "such disputes will often fail the preliminary question of

arbitrability because the parties did not agree to arbitrate them. Nevertheless, even if they are

covered by the arbitration clause, it is more likely that arbitration will conflict with the policy of

the Bankruptcy Code that created the right in dispute. The bankruptcy court enjoys much

greater discretion to refuse to compel the arbitration of this type of dispute." *Id.*

Though not explicitly distinguishing substantively core claims from procedurally core

claims, the *Iridium Operating* court found that a setoff defense can be particularly important in

regarding the claims as core, as "a setoff claim takes on particular importance in the context of

bankruptcy, as it, in effect, 'elevates an unsecured claim to secured status to the extent that the

debtor has a mutual, pre-petition claim' against the party asserting setoff . . . ." *Iridium*

*Operating*, 285 B.R. at 834 (quoting *N. Am. Energy Conservation, Inc. v. Interstate Energy Res.,*

*Inc. (In re N. Am. Energy Conservation, Inc.)*, No. 00-40563 (PCB), 00-2276, No. 00CIV4302

(SHS), 2000 WL 1514614, at *2 (S.D.N.Y. Oct. 12, 2000)). Furthermore, the *Iridium Operating*

---

[10]     More importantly, still, for present purposes, Judge Bernstein concluded "that the fraudulent transfer claims should be stayed against all defendants pending the conclusion of the arbitration." *Hagerstown,* 277 B.R. at 208. The rationale for doing so, however, was that the trustee's claims against the defendant "[we]re contractual in nature, relating to [the defendant's] performance under the [contract] and resulting liability. . . . The fraudulent conveyance claims are directly connected to the contract disputes, and present alternative theories of disaffirmance." *Id.* As explained further below, the fraudulent conveyance claim in this case is not directly connected to the performance of any contract between the Debtor and AGI—indeed, there was no contract between S.W. Bach and AGI. The fraudulent conveyance claim stands on its own; the outcome does not depend the outcome of otherwise arbitrable claims.

court distinguished situations in which defendants were "otherwise uninvolved in the underlying bankruptcy proceeding," versus defendants "intimately involved" with the bankruptcy; by "fil[ing] several proofs of claim, several claims for administrative expenses, and a claim for setoff," because "[t]he relationship [that] action has to the bankruptcy proceeding is more than simply a possible effect on the ultimate size of the bankruptcy estate." *Id.*

At the same time, other courts have found that where the action has a significant impact on the administration of the estate, though again, not explicitly distinguishing between a procedurally and substantively core claim, a claim can be "core." *See U.S. Lines*, 197 F.3d at 638. In *U.S. Lines*, the court noted that while "contract claims are not rendered core simply because they involve property of the estate," certain underlying insurance contract claims were "core," as indemnity insurance contracts, particularly where the debtor is faced within substantial liability claims within the coverage of the policy, "may well be . . . the most important asset of the [i.e. debtor's] estate," and resolving disputes will have a "significant impact on the administration of the estate," not just "augment the assets of the estate for general distribution," as the proceeds "represent the only potential source of cash available to that group of creditors," and "will not be made available until the Trust has paid the claims." *Id.* at 637-38 (internal quotation marks and citations omitted).

The court addresses in turn each claim for which AGI seeks arbitration. The Court concludes below that the Trustee has failed to demonstrate that Counts 8 and 10 are either "procedurally core" or "substantively core," such that they are not subject to mandatory arbitration. Even if Counts 8 and 10 were core, arbitration of the claims will not severely conflict with the policies of the Bankruptcy Code.

c.   *Count 8: Aiding and Abetting Breach of Fiduciary Duty Is a Non-Core Claim That Must Be Arbitrated*

Much of the authority concerning whether claims for aiding and abetting breach of fiduciary duty are arbitrable is in the context of whether the district court should withdraw the reference of an action to the bankruptcy court.  Courts consider other factors in addition to whether a claim is core or non-core with respect to withdrawing the reference that may not be especially relevant in the arbitration context.  For example, to withdraw the reference under 28 U.S.C. § 157(d), a court also considers: "(1) whether the claims are legal or equitable [as a bankruptcy court cannot hold a jury trial in a non-core matter]; (2) judicial efficiency;  (3) prevention of forum shopping; and (4) the uniformity in bankruptcy administration."  *Iridium Operating*, 285 B.R. at 834-35 (internal citations omitted).  Nevertheless, these courts' determinations are instructive whether aiding and abetting breach of fiduciary duty claims are core or non-core in the arbitration context.

Courts are split whether they find claims for aiding and abetting breach of fiduciary duty claims core when deciding to withdraw the reference.  For example, the *Iridium Operating* court refused to withdraw the reference and found an aiding and abetting breach of fiduciary duty claim core for seemingly procedural reasons: the defendant was intimately involved in the bankruptcy, filed multiple proofs of claim, administrative claims, and asserted setoff defenses concerning the contract at issue in the adversary proceeding.  *Id.*  Also, in *Cape Cod Mortgage Trust, Inc. v. Gee (In re Gee)*, No. 98 CIV 414 BSJ, 83327, 2000 WL 23251, at *3 (S.D.N.Y. Jan. 12, 2000), the court found that breach of fiduciary duty claims against an individual debtor were core because the "breach of fiduciary duty would not have arisen, were it not for the debtor's bankruptcy filing.  The Trustee's Complaint against the [defendants] alleges breach of fiduciary duty owed by the chapter 11 debtor-in-possession to his creditors, breaches of fiduciary

18

responsibility of professionals in dealing with estate property, and violations of the bankruptcy code's provisions mandating equitable distribution of the property of the estate."

Courts may find fiduciary duty claims core when they involve officers and directors of a debtor.  For example, in *Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises, Inc.)*, 73 B.R. 470, 480 (Bankr. D. Vt. 1987), the creditors committee sought to bring an action for breach of fiduciary duty, unjust enrichment and fraudulent conveyance claims, among other claims, against the probated estate of the debtor's sole stockholder, the stockholder's wife, who was an officer, and another corporate officer, Wilkinson.  The court noted that "28 U.S.C. §§ 157(b)(2)(A) and (O), 'catchall' provisions require something more than a mere bald and unilluminated self-serving declaration that a recovery would benefit the debtors' estate to constitute a core proceeding." *Id.* at 481.  However, the court found the "entire proceeding" against Wilkinson core, including causes of action for surcharge under 11 U.S.C. §§ 327(a) and 328(c) and breach of fiduciary duty against Wilkinson for failure to trace or recover misappropriated corporate funds, as the court already had core, or, at the very least, related to jurisdiction over the surcharge action due to Wilkinson's filing of a personal adversary proceeding against the estate for salary and expenses, even though that personal action did not "arise out of the same series of transactions" as the breach of fiduciary duty claim, "in the interest of judicial economy." *Id.* at 483-84.  Similarly, where the wife filed a declaratory action to recover certain pension proceeds, the court found that the Committee's action to recover the pension proceeds for the estate on theories including unjust enrichment and breach of fiduciary duty, core, as they arose out of the same transactions and involved the same res as the committee's causes of action. *Id.* at 493.  The other causes of action against the wife were core as fraudulent conveyance proceedings under 28 U.S.C. §§ 157(b)(2)(F) and (H). *See*

19

*also In re Verestar, Inc.*, 343 B.R. 444, 485-86 (Bankr. S.D.N.Y. 2006) (Judge Gropper decided

motion to dismiss regarding breach of fiduciary duty claims against parent company of debtor,

debtor's officers and directors and financial advisor for debtor and allegedly parent company

after district court had referred the action to the bankruptcy court).

Conversely, in *Mirant Corp. v. The Southern Co. (In re Mirant Corp.*), 337 B.R. 107,

117-18 (N.D. Tex. 2006) ("*Mirant*"), the court found that an aiding and abetting breach of

fiduciary claim against a former corporate parent was non-core because it was a "claim[] that

could proceed in another court even in the absence of bankruptcy," and was "based on a state-

created right," and, applying the withdrawal of the reference factors, determined "[t]he mere fact

that plaintiffs filed proofs of claim in the title 11 case does not convert the legal claims into

equitable claims." (Internal citation omitted).[11]  Similarly, the court in *In re SAI Holdings Ltd.*,

Bankr. No. 06-33227, Adv. Pro. No. 08-3036 (MAW), 2009 WL 1616663, at *9 (Bankr. N.D.

Ohio Feb. 27, 2009), found that "[p]repetition claims of breach of fiduciary duty [against

contract counterparties and other members of holding company of which debtor was a part] are

clearly not core proceedings." (Citing *Bliss Tech., Inc. v. HMI Indus., Inc. (In re Bliss Tech.,

Inc.),* 307 B.R. 598, 608-09 (Bankr. E.D. Mich. 2004) ("*Bliss Tech*")).  In *Bliss Tech*, 307 B.R. at

604, 607, 608-09, the court found that a state-law breach of fiduciary duty claim against officers

and directors based on prepetition conduct in a leveraged buyout could not constitutionally fit

within the catchall provisions of 28 U.S.C. § 157(b)(2)(A) and (O) even though Bankruptcy

Code §§ 544 and 550 claims arising out of the leveraged buyout were core.  And in *Messinger v.*

---

[11]    The decision in *Mirant* was criticized for its characterization of an alter-ego/veil piercing claim as legal,
determining that such claims have both legal and equitable roots.  *See In re Kollel Mateh Efraim, LLC*, 406 B.R. 24
(Bankr. S.D.N.Y. 2009).

*Chubb Group of Insurance Co.,* Case No. 1:06MC00121, 2007 WL 1466835, at *2 (N.D. Ohio

May 16, 2007), the court designated an aiding and abetting breach of fiduciary duty claim as

non-core because it sought "to adjudicate primarily private causes of action, . . . distinct from the

restructuring of debtor-creditor relations, which forms the heart of the federal bankruptcy court's

jurisdiction."  (Internal citation omitted).[12]

 Here, AGI did not file a proof of claim or assert a right to setoff in its affirmative

defenses.  Instead, the affirmative defenses asserted by AGI rely solely on "applicable and

controlling industry rules," SEC Rule 15c3-1 and 15c-3-3, and law regarding the effect of the

Debtor tendering its license to NASD and the conduct of individuals over whom AGI alleges it

had no control.  (AGI Answer, at 33-34.)  Accordingly, the aiding and abetting breach of

fiduciary duty claim is not procedurally core.

 As to whether the claim is substantively core, the Trustee essentially relies on the

argument that the claims against AGI involve the transfer of the most significant asset of the

estate—the right to manage the accounts—and will have a significant impact on the

administration of the estate.  However, the aiding and abetting breach of fiduciary duty claim

seeks to adjudicate a private cause of action against a non-creditor entity, for its alleged aiding

and abetting in the breach of fiduciary duties by the Debtor's principal.  This does not affect the

---

[12] Arguably, aiding and abetting breach of fiduciary duty would also be a compulsory counterclaim under a traditional FED. R. CIV. P. 13 analysis, but, not necessarily under FED. R. BANKR. P. 7013.  *See Rossi v. Wohl*, 633 F. Supp. 2d 270, 286 (N.D. Tex. 2009) (breach of fiduciary duty claim, based in part on attorney's alleged misrepresentation regarding a client's liability for expert fees where the client was sued for breach of contract regarding the fees, was compulsory counterclaim).  As the court noted in *J.T. Moran Financial Corp. v. American Consolidated Financial Corp. (In re J.T. Moran Financial Corp.)*, 124 B.R. 931, 940 (S.D.N.Y. 1991),"Rule 7013 differs from FED. R. CIV. P. 13 in that a party sued by a trustee or a debtor in possession need not assert as a counterclaim any claim against the trustee or debtor in possession or the estate unless the claim arose after the order for relief."  Here, however, this analysis is irrelevant.  AGI has not filed a proof of claim, and there are no compulsory counterclaims the Trustee would be required to assert against AGI under FED. R. CIV. P. 13 or FED. R. BANKR. P. 7013.

restructuring of debtor-creditor relations, nor does the aiding and abetting claim arise solely out

of the Debtor's obligations in bankruptcy.  *See Messinger*, 2007 WL 1466835, at *2; *In re Bliss*

*Tech., Inc.*, 307 B.R. at 608-09.[13]  There are no allegations that AGI is the alter ego of the

Debtor, or related to any principal of the Debtor in any degree close to that in *In re STN*

*Enterprises, Inc.*, 73 B.R. at 493.  The aiding and abetting breach of fiduciary duty claim is based

entirely on pre-petition conduct; while the Trustee asserts this conduct occurred within two years

of the petition date as required for the transfer of the Accounts to constitute a fraudulent

conveyance, the Trustee fails to demonstrate that this alleged breach arose out of anything other

than a non-contractual, industry relationship between a non-creditor and a non-debtor individual

for purposes of the aiding and abetting an alleged breach of fiduciary duty.  The Debtor could

pursue this claim against AGI absent the bankruptcy, just as the Debtor in *Mirant,* 337 B.R. at

117-18, could.

Furthermore, unlike in *U.S. Lines,* resolving the dispute whether AGI aided and abetted

Shapiro in any breach of fiduciary duty will not necessarily have a "significant impact on the

administration of the estate," as the Trustee alleges.  In *U.S. Lines*, 197 F.3d at 638, the proceeds

of the insurance policy at issue "represent[ed] the only potential source of cash available to that

group of creditors."  Here, the Trustee could at least recover some damages for estate for the

transfer of the Accounts in the fraudulent conveyance proceeding in this Court, especially

because, for the reasons explained below, the Court is staying the arbitration of Counts 8 and 10

pending its resolution of Count 9.  Accordingly, the aiding and abetting breach of fiduciary duty

---

[13]    That the Trustee contends Shapiro owed a fiduciary duty to creditors is not sufficient for the Court to find
that the aiding and abetting claims arise solely out of the Debtor's obligations in bankruptcy.  At the very least, as
this Court has noted before in this matter, the extent of fiduciary duties owed to creditors of an insolvent entity is a
question of complicated state law, and does not arise out of the Bankruptcy Code.  *See Togut v. RBC Dain*
*Correspondent Serv. (In re S.W. Bach & Co.)*, Bankr. No. 07-11569 (MG), Adv. Pro. No. 09-01278 (MG), 2010 WL
681000, at *6 (Bankr. S.D.N.Y. Feb. 24, 2010) (internal citations omitted).

claim here is non-core.  Even if the aiding and abetting breach of fiduciary duty claim was core,

arbitration of it will not conflict with important polices of the Bankruptcy Code.  Arbitration of

this claim will not "conflict with the trustee's core obligation to marshal and liquidate the assets

expeditiously," and "investigate and report on the financial affairs of the debtor." *See*

*Hagerstown*, 277 B.R. at 210.  The Court refers the aiding and abetting breach of fiduciary duty

claim against AGI to arbitration.

### D.    Count 10: Restitution and Unjust Enrichment Is a Non-Core Claim That Must Be Arbitrated

As with the aiding and abetting breach of fiduciary duty claim, much of the jurisprudence

concerning the core/non-core nature of the unjust enrichment and restitution claim is in the

withdrawal of the reference context.  Still, these decisions are instructive here.  Some courts find

unjust enrichment claims non-core, as they do not arise under the Bankruptcy Code.  *E.g.*, *Miller*

*v. Pierce*, CIV-09-96-FHS, Bankr. No. 08-80228-M; Adv. Pro. No. 08039-M, 2009 WL 919441,

at *1 (E.D. Okla. Mar. 31, 2009) ("Counts . . . (III) aiding and abetting a breach of fiduciary duty

. . . and (V) unjust enrichment, are related non-core proceedings"); *I.E. Liquidation, Inc. v.*

*Litostroj Hydro, Inc. (In re I.E. Liquidation, Inc.)*, Bankr. No. 06-62179, Adv. Pro. Nos. 08-

6077, 08-6078, 2009 WL 1586706, at *8 (Bankr. N.D. Ohio Mar. 18, 2009) (citing *Access Care,*

*Inc. v. Sten-Barr Network Solutions, Inc. (In re Access Care, Inc.)*, 333 B.R. 706, 711, 713

(Bankr. E.D. Pa.2005)); *In re SAI Holdings Ltd.*, 2009 WL 1616663, at *8-9 ("To the extent

[p]laintiff's claim seeks reimbursement for prepetition benefits conferred by Debtor's services

upon Defendant, it clearly does not involve a right created or determined by a statutory provision

of title 11 and could have been pursued outside of bankruptcy . . . .  The court concludes that

Plaintiff's unjust enrichment claim is related to Debtors' chapter 11 case but is a not a core

proceeding.") (citing *Hankin v. Auxiliary of the Winsted Mem. Hosp. (In re Winsted Mem.*

*Hosp.)*, 236 B.R. 556, 561 (Bankr. D. Conn. 1999)); *In re Pennsylvania Gear Corp.*, Bankr. No.

02-36436DWS, Adv. Pro. Nos. 03-0940, 03-0942, 2008 WL 2370169, *5 (Bankr. E.D. Pa. Apr.

22, 2008) ("the alternative count for breach of contract and unjust enrichment [are] clear non-

core proceedings") (internal citations omitted).  The Second Circuit allowed district court

findings that unjust enrichment claims were non-core and arbitrable to stand where a party did

not appeal that portion of the district court's ruling.  *See Hill*, 436 F.3d at 107.  Furthermore, in

*Liddle & Robinson, L.L.P. v. Daley (In re Daley)*, 224 B.R. 307, 313 (Bankr. S.D.N.Y. 1998),

the court refused to find core (though not ruling out that it might have related to jurisdiction)

unjust enrichment and fiduciary duty claims brought by the debtor's individual attorney's former

law firm against that attorney's new law firm, concerning work performed by the attorney at the

former law firm on behalf of the debtor; absent a disagreement over the priority of payment

between the law firms, as the court only had jurisdiction to determine the "*bona fides* of the

unsecured proofs of claim . . . whether [debtor's] estate is liable for fees billed to him . . . not

claims that [one law firm] is asserting against [the other law firm]."

Even in *In re I.E. Liquidation, Inc.*, 2009 WL 1586706, at *8, where the defendant had

filed a proof of claim, the court found an unjust enrichment claim non-core, as "[t]he validity of

[creditor-defendant's] proof of claim will almost certainly turn entirely on the facts that will be

litigated in the claims and counterclaims for breach of contract that Plaintiff and [creditor-

defendant] will bring against one another in [foreign court]," and "[f]ew legal issues and even

fewer factual issues appear likely to stand between the resolution of that non-core proceeding

and the matter of allowing or disallowing [creditor-defendant]'s claim against the estate."  *Id.*

On the other hand, other courts in this Circuit have considered unjust enrichment and

restitution claims core, where the claims arose out of the same facts as the proof of claim.

*Caldor Corp. v. S Plaza Assocs., L.P. (In re Caldor, Inc.),* 217 B.R. 121, 128 (Bankr. S.D.N.Y.

1998) (where creditor claimed for rent due in proof of claim, debtor's claim for unjust

enrichment for debtor's alleged overpayment of rent core); *In re STN Enterprises, Inc.*, 73 B.R.

at 493.  In *Navon v. Mariculture Prod. Ltd.*, 395 B.R. 818, 822 (D. Conn. 2008), the court found,

at the very least, "related to" bankruptcy jurisdiction over a debtor's wife's unjust enrichment

claim against a corporation that was solely owned by a corporation controlled by an individual

chapter 7 debtor to which the debtor's wife was the lender on a promissory note.  The claim was

core because litigation of the unjust enrichment claim would affect one of the most elemental of

all core bankruptcy functions: determining if a creditor may collect from a debtor's estate.  *Id.*

Still, the court found in the alternative that "[a]t the very least, the proceeding is within the

bankruptcy court's "related to" jurisdiction," which is a broader test, and also found that the

outcome would have a "significant impact on the administration of the estate." *Id.* (internal

quotation marks and citations omitted).  While, on a motion to dismiss, at least one bankruptcy

court dealt with an unjust enrichment claim against an individual who also purported to be the

alter ego of the debtor, the court did not explicitly decide whether the claim was core or non-

core.  *See Pereira v. Binet (In re Harvard Knitware, Inc.)*, 153 B.R. 617, 625 (Bankr. E.D.N.Y.

1993).

    Other courts have found unjust enrichment claims core where they decided that other,

related claims were core.  *In re 222 South Caldwell Street, Ltd. Partnership*, 409 B.R. 770, 790

(Bankr. W.D.N.C. 2009) (after determining that the decision whether an equitable lien was

created was core, the court disagreed that "relief should be available under the doctrine of unjust

enrichment"); *The Official Comm. of Unsecured Creditors of Neumann Homes, Inc. v. Neumann

(In re Neumann Homes, Inc.)*, 414 B.R. 383, 387-88 (N.D. Ill. 2009).  In *In re Neumann Homes,*

*Inc.*, 414 B.R. at 385, the court was deciding whether certain individual principals of an S-corporation debtor were entitled to tax refunds or whether those refunds had been fraudulently conveyed to the individuals. The court found that "[t]he crux of the . . . complaint [sought] to avoid allegedly preferential and fraudulent transfers." *Id.* at 388. The complaint also contained several state law claims, including breach of fiduciary duty and unjust enrichment, which the court found were "derived from the underlying core claims," and, thus, were core because they "ar[o]se out of the same transaction as the creditor's proof of claim such that the two claims are logically related," and were "premised on the underlying action to avoid the . . . fraudulent conveyances." *Id.* Similarly, in *Beal Bank, SSB v. Prince (In re Prince)*, Bankr. No. 197-11992, Adv. Pro. Nos. 108-0146, 108-0164, 2008 WL 4498948, at *3 (Bankr. M.D. Tenn. Aug. 19, 2008), the court found that "state law theories of conspiracy, fraud, malicious prosecution, conversion, and unjust enrichment" stemmed from the debtors' allegations in the adversary complaint that the defendants' conduct violated a discharge injunction. *Id.* Accordingly, "[t]he violations of the discharge injunction and damages that flow[ed] therefrom [we]re core proceedings, and the state law action [wa]s intimately intertwined with that action" and the state law claims were core. *Id.*

Here, the unjust enrichment and restitution claim is pled in the alternative to the fraudulent conveyance claim, which AGI acknowledges is non-arbitrable. As noted *supra*, AGI has not filed a proof of claim in this action; nor does it assert any right of setoff. AGI has no contract with the Debtor. As noted *supra*, there are no allegations that it is the alter ego, or related to any principal of the Debtor in any degree close to that in other cases. *See In re Harvard Knitware, Inc.*, 153 B.R. at 625; *In re STN Enterprises, Inc.*, 73 B.R. at 493. AGI's affirmative defenses relate to industry standards and state law. The Trustee seeks reimbursement

for prepetition benefits (the right to manage the Accounts) conferred by a principal of the Debtor

upon AGI, which "clearly does not involve a right created or determined by a statutory provision

of title 11 and could have been pursued outside of bankruptcy." *In re SAI Holdings Ltd.*, 2009

WL 1616663, at *8.

While the "damages that flow" from the unjust enrichment may have some overlap with

damages for the fraudulent conveyance claim, the unjust enrichment claim is not intimately

intertwined with the fraudulent conveyance claim. *See In re Prince*, 2008 WL 4498948, at *3.

Fraudulent conveyance claims under 11 U.S.C. § 548 relate to transfers that occurred within two

years of the petition date while the debtor was insolvent. The Trustee asserts an unjust

enrichment claim against AGI regardless of when the transfer of the Accounts occurred, or that

the transfer occurred while the Debtor was insolvent. That both causes of action may involve

findings that there was no consideration for the transfer is not dispositive. The unjust enrichment

claim, though pled in the alternative to the fraudulent conveyance claim, is derivative of the

Debtor's rights in prepetition business dealings; it relates to whether Shapiro sought benefits for

himself, in violation of his fiduciary duties, by transferring the Accounts to AGI for no

consideration in anticipation of a benefit Shapiro thought he would receive.[14] The Trustee could

pursue the unjust enrichment claims outside of bankruptcy even if the transfers had not occurred

within two years of the petition date, and the debtor was not insolvent. Accordingly, the unjust

enrichment/restitution claim is non-core. Even if the unjust enrichment and restitution claim is

core, arbitration of this claim will not "conflict with the trustee's core obligation to marshal and

liquidate the assets expeditiously," and "investigate and report on the financial affairs of the

---

[14]    AGI has admitted that it paid no consideration to the Debtor for the transfer of the Accounts by virtue of its
failure to timely respond to the Trustee's First Requests for Admission. *In re S.W. Bach & Co.*, 2010 WL 681000, at
*7.

debtor." *See Hagerstown*, 277 B.R. at 210. As it does for Count 8, the Court refers the unjust

enrichment and restitution claim, Count 10, to arbitration.

### E.     Whether to Stay the Balance of the Proceedings Pending Arbitration

For the reasons explained below, though referring Counts 8 and 10 to arbitration, the

Court declines to stay consideration of Count 9 in this court while staying the arbitration of

Counts 8 and 10 until Count 9 is resolved.

Judge Bernstein in *Hagerstown* noted that non-arbitrable claims are not subject to the

mandatory stay required by Section 3 of the FAA. *Hagerstown*, 277 B.R. at 199 n.18 (citing

*Citrus Mkting. Bd. v. J. Lauritzen A/S*, 943 F.2d 220, 225 (2d Cir. 1991)). Instead, the decision

to stay non-arbitrable claims is "committed to the court's discretion." *Id.* at 199 (citing *Genesco,

Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 856 (2d Cir. 1987)). A broad stay order should be

issued where "the arbitrable claims predominate the lawsuit and the non-arbitrable claims are of

questionable merit." *Id.* (internal quotation marks and citations omitted). Also, broad stay

orders are appropriate if the stay will "promote judicial economy, avoidance of confusion and

possible inconsistent results" without working an undue hardship or prejudice against the

plaintiff. *Id.* (citing *Acquaire v. Canada Dry Bottling*, 906 F. Supp. 819, 838 (E.D.N.Y. 1995)

(internal citation omitted); *The Orange Chicken, L.L.C. v. Nambe Mills, Inc.*, No. 00 Civ. 4730,

2000 WL 1858556, at *9 (S.D.N.Y. Dec. 19, 2000); *Gen. Media, Inc. v. Shooker*, No. 97 CIV

510 (DAB), 1998 WL 401530, at * 11 (S.D.N.Y. Jul. 16, 1998); *Moore v. Interacciones Global,

Inc.*, No. 94 Civ. 4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995)). In *Moore v.

Interacciones Global, Inc.*, 1995 WL 33650, at *7, the court found that a broad stay was

appropriate where there were common questions of fact among the non-arbitrable and arbitrable

claims, or when the arbitration was likely to dispose of issues common to the claims of the arbitrating and non-arbitrating defendants.

Still, section 105 of the Bankruptcy Code authorizes the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," including enjoining proceedings in other forums against non-debtors. *See* 11 U.S.C. § 105(a); *McHale v. Alvarez (In re The 1031 Tax Group, LLC)*, 397 B.R. 670, 674 (Bankr. S.D.N.Y. 2008) ("*Alvarez*"). In *Alvarez*, the Chapter 11 Trustee sought a preliminary injunction enjoining certain state court plaintiffs from prosecuting three state court actions against former employees of the debtors, involving claims of violations of a state consumer protection act, negligence, breach of fiduciary duty, fraudulent and negligent misrepresentation and nondisclosures, conspiracy and aiding and abetting misconduct. *Id.* at 674, 680. According to the Chapter 11 Trustee, the actions "threaten[ed] to undermine two [proposed] settlement agreements ["Settlements"] the Trustee [ ] negotiated with certain of the [d]ebtors' former employees and also with several of its errors and omissions ["E&O"] insurers." *Id.* at 674. The Settlements involved (1) payment by certain former employees ("Former Employees") to the estate, a waiver of certain claims they had against the estate, an assignment of their rights in the debtors' E&O insurance policies, and an injunction against all third party litigation against those employees and, if necessary, a stay on all such litigation until a permanent injunction was obtained; and (2) payment by the E&O insurers (about 84% of the policy limits) and a channeling injunction to the bankruptcy court against any claims made against the E&O policies, which would apply the claims against a limited portion of the amount paid by the E&O insurers under the settlement, which would be segregated and held in trust to pay any claims of non-debtor insureds. *Id.* at 676-77. Two groups of the state court plaintiffs (one which had filed a proof of claim, and one

which had not), filed a motion in state court seeking a writ of attachment or a preliminary
injunction to take control of the assets of the Former Employees, which precipitated the filing of
an adversary proceeding and the request for a temporary restraining order and preliminary
injunction. *Id.* First, this Court found that breach of fiduciary duty claims against the former
employees were derivative, and not direct, and belonged to exclusively to the Trustee;
accordingly, the automatic stay under the Bankruptcy Code applied to the derivative claims in
the state court actions. *Id.* at 680-81. The fraud claims, however, were direct claims, and could
be "asserted by [the state court plaintiffs] without violating the automatic stay." *Id.* at 682 (citing
*In re Granite Partners*, 194 B.R. 318, 327 (Bankr. S.D.N.Y. 1996) ("*Granite Partners*")).
However, this Court granted a preliminary injunction against state court plaintiffs from
prosecuting their direct claims against the non-debtor former employees under Bankruptcy Code
§ 105(a) until this Court could consider approving one of the Proposed Settlements and to
accommodate the Chapter 11 Trustee's representation that he intended to propose a chapter 11
liquidation plan within several months. *Id.* at 686. In so doing, this Court stated:

> Because 105(a) injunctions are authorized by statute, they do not need to
> comply with the traditional requirements of Fed. R. Civ. P. 65. Rather, the
> bankruptcy court may enjoin proceedings in other courts when it is
> satisfied that such a proceeding would defeat or impair its jurisdiction with
> respect to a case before it. To enjoin claims against non-debtors under
> 105(a), a bankruptcy court must find that the claims threaten to thwart or
> frustrate the debtor's reorganization efforts, and that the injunction is
> important for effective reorganization . . . . [T]he courts have recognized
> that a stay should be provided to codefendants when the claims against
> them and the claims against the debtor are inextricably interwoven,
> presenting common questions of law and fact, which can be resolved in
> one proceeding. [T]he court [in *Granite Partners*, 194 B.R. at 337] noted
> that a court should consider, among other relevant factors, whether the
> suits would (i) threaten the debtor's insurance coverage, (ii) increase the
> debtor's indemnification liability, (iii) result in inconsistent judgments,
> (iv) expose the debtor to risks of collateral estoppel or *res judicata* and (v)
> burden and distract the debtor's management by diverting its manpower
> from reorganization to defending litigation**.**

*Id.* at 684 (internal quotation marks and other citations omitted).

The Court applies the *Alvarez* factors here in determining whether this Court should stay the arbitration of Counts 8 and 10 by the Trustee against non-debtor AGI until this Court has adjudicated Count 9. *Granite Partners* factors (i), (ii) and (v) are not present here because the claims are asserted by the Trustee against AGI, and not vice versa. However, as explained further below, *Granite Partners* factors (iii) and (iv) weigh strongly in favor of staying the arbitration of Counts 8 and 10 until this Court has adjudicated Count 9. Furthermore, the arbitration of Counts 8 and 10 before this Court rules on Count 9 would impair this Court's exclusive jurisdiction with respect to the Debtor's bankruptcy, and could thwart the Debtor's bankruptcy proceeding by taking from this Court a fraudulent conveyance claim that clearly arises under the Bankruptcy Code. The outcome of the fraudulent conveyance claim does not depend on the outcome of the aiding and abetting breach of fiduciary duty and unjust enrichment/restitution claims.

With respect to *Granite Partners* factor (iv), whether the proceedings will expose the debtor to risks of collateral estoppel or *res judicata*, courts as are split whether, and when, an arbitration proceeding forms the predicate for collateral estoppel. For example, in *Grafstrom v. Bear, Stearns & Co.*, No. 85 Civ. 3679 (JFK), 1986 WL 13806, at *1-2 (S.D.N.Y. Nov. 24, 1986), the court found "[t]he use of collateral estoppel to issues adjudicated in an arbitration is appropriate, despite the fact that arbitrators need not make detailed findings of fact." (Internal citations omitted). It gave collateral estoppel effect to findings in an arbitration proceeding as to "whether the defendant committed fraud, made any misrepresentations, issued any fraudulent or misleading advertisement, or improperly retained the defendant's funds" in an action for breach of fiduciary duties and violations of federal securities laws. *Id.*

In *In re Zangara*, 217 B.R. 26, 29 (Bankr. E.D.N.Y. 1998) ("*Zangara*"), the bankruptcy court gave collateral estoppel effect to an arbitration panel's findings that "[debtor] made unauthorized trades in his account, in violation of the Texas Deceptive Trade Practices Act ("DPTA") . . . and Section 33 of the Texas Securities Act." The other party to the arbitration also asserted alleged violations of Section 10(b) of the Securities Exchange Act of 1934, alleged violations of Sections 5 and 12(1) of the Securities Act of 1933, and alleged violations of the NASD Rules of Fair Practice against the debtor, but "the [a]rbitrators clearly indicated that their decision was not based" on those claims. *Id.* The bankruptcy court found that "the absence of specific factual findings and reasoning [in the arbitration award] [wa]s counterbalanced by the fact that the arbitrators have clearly enunciated the statutory basis for the Award [Texas Business and Commerce Code and Section 33 of the Texas Securities Act]," and "all three statutes relied upon by the Arbitration Panel in issuing the Award involved fraud by reason of making a false representation or a materially misleading statement on which the claimant relied to claimant's detriment." *Id.* at 29-30. The *Zangara* court found "a Texas court would give preclusive effect to the Arbitration Award insofar as it bars dischargeability of the debt pursuant to 11 U.S.C. § 523(a)(2)(A)." *Id.* at 32. Specifically, the court noted that certain findings under Texas state law implied certain facts necessary to establish all the elements of an 11 U.S.C. 523(a)(2)(A) claim, and, thus, the "Arbitrators decided the identical issue in the Arbitration Proceeding that this Court is called upon to decide with regard to [plaintiff's] Section 523(a)(2)(A) cause of action." *Id.* at 34. First, the award of punitive damages implied that "[debtor] made the false representation with an awareness of its falsity and committed the fraud described in Section 27.01(a), which satisfie[d] the first and second elements of Section 523(a)(2)(A)," and also indicated the debtor had the requisite intent to deceive, satisfying the third element of Section

523(a)(2)(A). *Id.* "The award of actual damages by the arbitrators demonstrate[d] that [debtor's] false representation was the proximate cause of [other party's] loss." *Id.* Lastly, "[s]ince the Arbitration Panel applied the standard of justifiable reliance in issuing the award, the fourth prong of the Section 523(a)(2)(A) nondischargeability test [wa]s met." *Id.*; *see also Hagerstown*, 277 B.R. at 199 n.19 (citing *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)). In *Boguslavsky*, 159 F.3d at 718, the court gave collateral estoppel effect to some findings in an earlier NASD proceeding on the same causes of action (violation of Rules 10b-5 and 10b-10, 17 C.F.R. §§ 240.10b-5, 240.10b-10 (1998), promulgated under the Securities Exchange Act of 1934 (the "1934 Act")) as plaintiff attempted to later assert in the district court. However, in the district court, the plaintiff additionally added a claim "that his transaction with [defendant] was 'unlawful and void' under § 29 of the 1934 Act" and asserted claims against individual employees of the other party to the arbitration as "controlling persons" under § 20 of the 1934 Act. *Id.* The court would not give collateral estoppel effect to the arbitration decision with respect to these two claims, but noted the arbitration "preclude[d] litigation of the issue of damages resulting from the underlying primary violation of Rules 10b-5 and 10b-10, which, in turn, may affect the ultimate disposition of [plaintiff's] § 20(a) action. [Plaintiff] brought his claims in both the NASD proceeding and the District Court action for the same injury. Thus, because under § 20(a) the defendants would be liable as controlling persons jointly and severally with the primary violators, [plaintiff's] possible recovery under § 20(a) cannot exceed the damages assessed by the arbitrators against the primary violators. The issue of compensatory damages, therefore, is totally precluded from relitigation in the District Court." *Id.* at 721 (internal citation omitted).

Some courts also will apply collateral estoppel effect specifically to factual findings in arbitration proceedings. *Doreen Ltd. v. Building Material Local Union 282*, 299 F. Supp. 2d 129, 145 (E.D.N.Y. 2004) (internal citations omitted) (giving collateral estoppel effect to factual findings in confirmed arbitration decision that employer owed wages under collective bargaining agreements to local union drivers in RICO action brought by employer against union and certain employee benefit plan trustees).

Earlier Supreme Court cases, however, took a more conservative approach to whether collateral estoppel effect could apply to arbitration findings and conclusions. For example, in *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 216 (1985), a party sought to compel the arbitration of numerous state law claims which were "intertwined" with other federal securities laws claims, which would remain in court. The Supreme Court noted that some circuit courts refuse to compel arbitration where "arbitration of an 'intertwined' state claim might precede the federal proceeding and the factfinding done by the arbitrator might thereby bind the federal court through collateral estoppel." *Id.* at 217. The Court, while not fashioning a general rule as the arbitration had not yet occurred, noted "it is far from certain that arbitration proceedings will have any preclusive effect on the litigation of nonarbitrable federal claims." *Id.* at 222. In *McDonald v. City of West Branch, Michigan*, 466 U.S. 284, 292 (1984), the Court refused to afford either *res judicata* or collateral estoppel effect to an arbitration award in a 42 U.S.C. § 1983 context. The Court took into account that an "arbitrator may not . . . have the expertise required to resolve the complex legal questions that arise in § 1983 actions"; that "arbitral factfinding is generally not equivalent to judicial factfinding"; that the "record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination,

and testimony under oath, are often severely limited or unavailable." *Id.* at 290-91 (internal

citation omitted).  Instead, "in a 1983 action, an arbitration proceeding cannot provide an

adequate substitute for a judicial trial . . . [and] according preclusive effect to arbitration awards

in 1983 actions would severely undermine the protection of federal rights that the statute is

designed to provide." *Id.* at 292.

The most recent Second Circuit case regarding the collateral estoppel effect of an

arbitration decision is *Bear, Stearns & Co., Inc. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d

Cir. 2005), which indicates that whether a court applies collateral estoppel regarding an

arbitration decision in within the Court's broad discretion:

> [a]n arbitration decision *may* effect collateral estoppel in a later litigation
> or arbitration if the proponent can show with clarity and certainty that the
> same issues were resolved.  Collateral estoppel *is permissible* as to a given
> issue if (1) the identical issue was raised in a previous proceeding; (2) the
> issue was actually litigated and decided in the previous proceeding; (3) the
> party had a full and fair opportunity to litigate the issue; and (4) the
> resolution of the issue was necessary to support a valid and final judgment
> on the merits.

(internal quotation marks and citations omitted) (emphasis added).  The court afforded collateral

estoppel effect to an arbitration panel's finding that a clearing broker had not aided and abetted

securities fraud to similar claims arising out of the "same fraud," where, in a later arbitration, an

individual plaintiff sought to use collateral estoppel offensively to preclude the clearing broker

from arguing certain defenses it had argued against the another individual plaintiff in an earlier

arbitration.  *See id.* at 93.

Some courts applying factors similar to the *Bear, Stearns & Co., Inc.* factors will not

apply collateral estoppel where the "arbitrators never made or adopted any findings of fact," as

the court will "not infer the factual basis for the arbitrator's decision and then use those

inferences" for the purposes of collateral estoppel. *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 417 (Bankr. S.D.N.Y. 2003).

Here, it is possible that collateral estoppel would apply such that this Court would be deprived of its necessary jurisdiction over the 11 U.S.C. § 548 fraudulent conveyance claim, and, thus, as explained further below, *Granite Partners* factors (iii) and (iv) weigh heavily in favor of staying the arbitration of Counts 8 and 10 pending this Court's resolution of Count 9. Conversely, the *Hagerstown* factors weighing in favor of a broad stay order are not applicable here.

A broad stay order is not appropriate here because Count 9 is not "directly connected" to Counts 8 and 10 as the fraudulent conveyance claim was to the breach of contract claim in *Hagerstown. See Hagerstown*, 277 B.R. at 208. Despite the fact that the Trustee pled the unjust enrichment/restitution claim (Count 10) in the alternative to the fraudulent conveyance claim (Count 9), the Trustee could still assert a claim for fraudulent conveyance against AGI even assuming, *arguendo*, that AGI did not aid and abet any breach of fiduciary duty by Shapiro and/or was not unjustly enriched by the transfer of the Accounts. The elements of the aiding and abetting breach of fiduciary duty claim, as pled in the Complaint, are "[1] Shapiro owed fiduciary duties of loyalty and candor to the Debtor, and he was required to control the Debtor in a fair, just and equitable manner, and he was obligated to act in furtherance of the best interests of the Debtor, its shareholders, and its creditors; [2] [AGI] knew Shapiro owed fiduciary duties to the Debtor; [3] [AGI] knowingly provided substantial assistance to Shapiro in breaching those fiduciary duties, including by [i] inducing Shapiro to transfer the Accounts with the false promise of compensation and future employment, [ii] assisting with the [transfer of the Accounts], and [iii] accepting the [transfer of the Accounts], to achieve a benefit for itself.

(Compl. ¶¶ 208-211.)  The elements of unjust enrichment, as pled in the Complaint, are [1] AGI

obtained the right to manage the Accounts prior to the Petition Date; [2] the Debtor did not

receive any consideration for the [transfer of the Accounts]; [3] [AGI] has earned substantial

profits/fees from managing the accounts, constituting an inequitable windfall to [AGI]'s benefit,

and [4] [AGI] should not be able to continue profiting from the Accounts without compensating

the Debtor ."  (Compl. ¶¶ 221-226.)  The Trustee seeks compensatory, consequential and

punitive damages from AGI under Count 8, and "proper[], fair[] and equitabl[e]" compensation

under Count 10.  (Compl. ¶¶ 212, 226.)

Conversely, 11 U.S.C. § 548(a)(1)(B) provides, in relevant part (1) "The trustee may

avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by

the debtor, that was made or incurred on or within 2 years before the date of the filing of the

petition, if the debtor voluntarily or involuntarily—(B)(i) received less than a reasonably

equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date

that such transfer was made or such obligation was incurred, or become insolvent as a result of

such transfer or obligation . . . ."  The damages the Trustee seeks for Counts 8 and 10 are broader

than, but arguably inclusive of, those it seeks for Count 9.  The Trustee seeks damages in "an

amount not less than the amount of the value of the Accounts Transfer, plus interest from the

date hereof and the costs and expenses of this action including, without limitation, attorneys'

fees."  (Compl. ¶ 219.)

While 11 U.S.C. § 548(a)(1)(B) permits a trustee to recover transfers "for less than a

reasonably equivalent consideration," the purpose of the trustee's avoidance powers is to protect

creditors, and arguably to encourage an equitable distribution of the debtor's property to

creditors, and, in turn, prevent a debtor from favoring one creditor or third party over other

creditors, all of which go to the "heart of federal bankruptcy proceedings" of restructuring debtor-creditor relations. *See Messinger*, 2007 WL 1466835, at *2; *In re French*, 440 F.3d 145, 152 (4th Cir. 2006) ("[P]urpose of the Bankruptcy Code's avoidance provisions . . . is to prevent debtors from illegitimately disposing of property that should be available to their creditors."); *see also In re Richardson*, 23 B.R. 434, 447 (Bankr. Utah 1982)("[T]he function of Section 548 i[s] fostering an equitable distribution of the debtor's property."); *but cf. In re United Energy Corp.*, 944 F.2d 589, 597 (9th Cir. 1991) ("the policy behind section 548 is to preserve the assets of the estate. This policy differs from that which undergirds the law of preferences. The aim of preference law under the Bankruptcy Code is to guard all parties by promoting equal distribution of the debtor's estate.")(internal citations omitted). In any event, here, AGI is not a creditor. AGI neither filed any proof of claim nor asserted any right of setoff against the Debtor. AGI had no contractual relationship with the Debtor. Accordingly, the recovery of amounts by which AGI was allegedly unjustly enriched, or for its alleged aiding and abetting any breaches of fiduciary duty, do not have an effect on debtor-creditor relations.

Furthermore, the factors supporting the injunction against the state court proceedings against the non-debtors in *Alvarez* and *Granite Partners* weigh in favor of the court deciding Count 9 and staying the arbitration of Counts 8 and 10 pending the outcome of that proceeding. *See Alvarez*, 397 B.R. at 684. The elements of Counts 8, 9 and 10, as explained above, do not necessarily overlap as they did in *Zangara*. *See Zangara,* 217 B.R. at 32. However, because factual findings as to the amount (if any) AGI was unjustly enriched in the arbitration of Count 10 due to any lack of consideration for the transfer of the Accounts,[15] the Court in turn could be

---

[15]    As noted *supra*, AGI has admitted in discovery there was no consideration for the transfer of the Accounts. *See* n.13, *supra*.

bound as to whether AGI "received less than a reasonably equivalent value" in exchange for the rights to manage the accounts by the arbitration panel's determination as to consideration, and its determination of the amount of the fraudulent conveyance could be limited by the arbitration panel's decision regarding Count 10, even though it involves a different cause of action. *See Boguslavsky,* 159 F.3d at 720. The only damages at issue for Counts 8, 9 and 10 is the value of the rights to manage the Accounts. Accordingly, the arbitration of Counts 8 and 10 could interfere with this Court's exclusive jurisdiction over deciding the amount of the fraudulent conveyance claim.

While the FINRA Panel may not make any findings of fact that would bind the Court with respect the issue whether AGI received less than reasonably equivalent value for purposes of the fraudulent conveyance claim (though AGI has been deemed to admit that there was no consideration for the transfer), the Court need not take the risk that it will, potentially leading to inconsistent results. Even if collateral estoppel effect will not apply to any arbitration awards regarding Counts 8 and 10, inconsistent judgments detrimental to the Debtor could result if the Arbitration Panel is permitted to decide the amount owed to the Trustee for any alleged Transfer of the Accounts before this Court decides the fraudulent conveyance claim within its core jurisdiction.

**CONCLUSION**

For the reasons explained above, AGI's motion to compel arbitration of Counts 8 and 10 of the Complaint is **GRANTED**, however, arbitration of those claims is **STAYED** pending the outcome in this Court with respect to Count 9**.**  AGI's motion to stay this Court's consideration of Count 9 is **DENIED.**

**IT IS SO ORDERED**.

Dated:    New York, New York
            March 10, 2010

                                        **/s/ Martin Glenn**
                                    HONORABLE MARTIN GLENN
                                    UNITED STATES BANKRUPTCY JUDGE