UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x    **FOR PUBLICATION**

In re    :
    :
S.W. BACH & COMPANY,    :    Chapter 7
    :    Case No. 07-11569 (MG)
    Debtor.    :

----------------------------------------------------------------x
    :
ALBERT TOGUT, as Chapter 7 Trustee of    :
S.W. BACH & COMPANY,    :
    Plaintiff,    :
    :    Adv. Proc. No. 09-01278 (MG)
    v.    :
    :
RBC DAIN CORRESPONDENT SERVICES,    :
A DIVISION OF RBC DAIN RAUSCHER INC.,    :
RBC CAPITAL MARKETS CORPORATION    :
(f/k/a RBC DAIN RAUSCHER, INC.),    :
ANDREW GARRETT, INC., SCOTT SHAPIRO    :
and JAS MANAGEMENT,    :
    :
    Defendants.    :
----------------------------------------------------------------x

**OPINION AND ORDER GRANTING THE CHAPTER 7 TRUSTEE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**


*A P P E A R A N C E S:*

TOGUT, SEGAL & SEGAL LLP
*Attorneys for Albert Togut, Chapter 7 Trustee*
One Penn Plaza, Suite 3335
New York, NY 10119
By:    Steven S. Flores, Esq.

LAW OFFICES OF JOSEPH M. HEPPT
*Attorneys for Defendant Andrew Garrett, Inc.*
260 Madison Avenue, 21st Floor
New York, NY 10016
By:    Joseph M. Heppt, Esq.

1

**MARTIN GLENN**
**United States Bankruptcy Judge**

Albert Togut, the chapter 7 trustee ("Trustee") of S.W. Bach & Company ("S.W. Bach"

or the "Debtor"), a former broker-dealer, seeks partial summary judgment under FED. R. CIV. P.

56, made applicable to bankruptcy proceedings by FED. R. BANKR. P. 7056, against broker-dealer

Andrew Garrett, Inc. ("AGI"), on the Trustee's constructive fraudulent transfer claim under 11

U.S.C. §548(a)(1)(B) ("Count Nine"). ("Motion"). AGI in turn seeks denial of partial summary

judgment and a dismissal of Count Nine.

On February 23, 2007, S.W. Bach's president, Scott Shapiro ("Shapiro"), directed S.W.

Bach's clearing agent, RBC Dain Correspondent Services/RBC Capital Markets Corporation

(collectively, "RBC Dain"), to transfer S.W. Bach's customer accounts (with the attendant right

to manage the accounts, as well as customer information and relationships) to AGI. It is the

transfer of those accounts without consideration that the Trustee challenges as a constructive

fraudulent conveyance. At the time Shapiro directed RBC Dain to transfer the accounts to AGI,

Shapiro filed a Uniform Request for Broker-Dealer Withdrawal ("Form BDW") with the

Securities and Exchange Commission ("SEC") and the National Association of Securities

Dealers ("NASD"), requesting withdrawal of S.W. Bach's registration as a broker-dealer. The

effect of the filing of the Form BDW was to require S.W. Bach immediately to cease conducting

its securities business.

The only disputed issue that must be resolved on this summary judgment motion is the

legal issue whether the transfer of the accounts resulted in a "transfer of an interest of the debtor

in property" under section 548(a)(1)(B) of the Bankruptcy Code. The Trustee argues that it does;

AGI argues that the filing of the Form BDW terminated S.W. Bach's rights in the accounts such

2

that the transfer without consideration was not a transfer of an interest of the debtor in property.

For the reasons explained below, the Court grants the Trustee's motion for partial summary

judgment, concluding that the transfer of the accounts was a "transfer of an interest of the debtor

in property" pursuant to 11 U.S.C. § 548(a)(1)(B). As the other elements of the constructive

fraudulent conveyance have been established, liability is established and what remains are issues

concerning damages for which a trial will be required.

## I.    BACKGROUND

### A.    Undisputed Material Facts[1]

During 2006, S.W. Bach's financial condition was deteriorating to the point that it risked

failing to meet capital requirements for a broker-dealer. Absent an infusion of capital or a sale of

the business, S.W. Bach faced the compelled shut down of its business. In October 2006,

Shapiro began meeting with AGI to discuss a possible transfer of the customer accounts serviced

---

[1]    In *S.W. Bach & Co. v. RBC Dain Correspondent Servs.(In re S.W. Bach & Co.)*, Bankr. No. 07-11569, Adv. No. 09-01278, 2010 WL 681000 (Bankr. S.D.N.Y. Feb. 24, 2010) ("RFA Decision"), the Court deemed admitted the facts that were the subject of several requests for admission to which AGI failed to timely respond. In considering a motion for summary judgment, FED. R. CIV. P. 56(d)(1) provides that "[i]f summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts – including items of damages or other relief – are not genuinely at issue. The facts so specified must be treated as established in the action." Local Rule 7056-1 provides, *inter alia*, that "(d) [e]ach numbered paragraph in the statement of material facts required to be served by the moving party shall be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party," and "(e) Each statement by the movant or opponent pursuant to subdivisions (b) or (c) of this rule, including each statement controverting any statement of material fact by a movant or opponent, shall be followed by citation to evidence which would be admissible." Accordingly, the Court finds the following material facts as undisputed because they are either (i) deemed admitted by AGI pursuant to the RFA Decision; (ii) explicitly not disputed by AGI in whole or in relevant part in its response to the Trustee's Statement of Uncontested Material Facts Submitted in Support of Motion for Partial Summary Judgment Against AGI, Pursuant to Local Rule 7056-1(b) of the Local Rules of Bankruptcy Procedure (ECF # 116) ("Trustee Stmt."); or (iii) not supported by any citation to evidence which would be admissible in AGI's response to the Trustee Stmt. *See also Seltzer v. U.S. (In re Seltzer)*, No. 04-2286-MG, 2007 WL 98495, at *5 (Bankr. S.D.N.Y. Jan. 9, 2007) (deeming facts in a Local Rule 7056-1 Statement admitted because the opposing party "rests upon a conclusory denial, insufficient for purposes of a summary judgment motion.") (citing *Colavito v. New York Organ Donor Network, Inc.*, 438 F.3d 214, 222 (2d Cir. 2006)). With respect to any disputed facts, however, throughout the opinion the Court will draw all inferences in favor of the party opposing the Motion, AGI. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

by S.W. Bach, including all customer information and the right to earn fees from managing the accounts (collectively, the "Accounts") from S.W. Bach to AGI.  (*See* Trustee Stmt. at ¶¶ 9, 11.) On or about October 4, 2006, S.W. Bach provided AGI with seven e-mails with financial information concerning the Debtor.  (*See id*. at ¶ 12.)  On February 14, 2007, Andrew Sycoff, the president of AGI ("Sycoff"), attended a meeting with the NASD to discuss AGI's potential acquisition of the Accounts.  (*Id*. at ¶¶ 14-15.)  Sycoff did not disclose that meetings with Shapiro began in October 2006.  (*Id*. at ¶ 18.)  Following the meeting, Sycoff informed the NASD that AGI did not wish to purchase the Accounts, but instead would play the role of a "white knight" to "provide a safe haven for the customers and brokers because of the ease of cutting them over to our system because both firms cleared through RBC Dain."  (*See id*. at ¶¶ 8, 17.)

The right to manage the Accounts was a valuable right, and an asset of S.W. Bach, at least until February 23, 2007.  (*Id.* at ¶ 40.)  Furthermore, prior to February 23, 2007, AGI promised Shapiro that it was going to employ Shapiro following a transfer of the Accounts and pay a fee for the Accounts to Shapiro, and engaged in various communications with Shapiro regarding transferring the Accounts.  (*Id*. at ¶¶ 10, 19-20.)  On or about February 21, 2007, Sycoff purchased computers, acquired office space at least on a temporary basis, and arranged for AGI personnel to be flown to New York in anticipation of possibly acquiring the Accounts from S.W. Bach.  (*Id.* at ¶¶ 28, 29.)

On February 23, 2007, S.W. Bach transferred at least some of the Accounts to AGI and received no consideration in return.  (*See id.* at ¶ 1.)  AGI does not dispute that a broker-dealer's right to manage accounts is customarily sold.  (*Id.* at ¶ 46.)  Shapiro filed the Form BDW with the SEC and NASD on February 23, 2007.  (*See id*. at ¶ 21); 17 C.F.R. § 249.501a (2010).  AGI

knew that Shapiro was going to file the Form BDW before he did so.  (*Id*. at ¶ 27.)  Shapiro, in

turn, knew that upon filing of the Form BDW, the Accounts would be transferred to AGI, and

Shapiro, contemporaneously with the filing of the Form BDW, directed S.W. Bach's clearing

firm, RBC Dain, to transfer the Accounts to AGI.  (*See id*. at ¶ 23.)[2]  RBC Dain followed

Shapiro's directive.  (Trustee Stmt. at ¶ 24.)

Immediately after the close of business on February 23, 2007, AGI became responsible

for the Accounts.  (*Id*. at ¶ 30.)  On March 2, 2007, AGI notified the S.W. Bach's customers

---

[2]      At the hearing on the Motion, AGI's counsel represented that some Accounts were transferred from S.W.
Bach to AGI without the accompanying S.W. Bach broker that had previously serviced those Accounts.  (Tr. of June
22, 2010 Hr'g (ECF # 127) ("Hr'g Tr.") at 49:1-5 ("It's my understanding that there were some accounts transferred
to Andrew Garrett that did not have an S.W. Bach broker in charge transferred over.  I don't know the number, but I
think – I think it was a small number of accounts.").)  Furthermore, AGI's counsel acknowledged that AGI received
Accounts which S.W. Bach, as opposed to the individual S.W. Bach broker previously servicing those Accounts,
developed at its own expense which were then serviced by an S.W. Bach broker.  (*See* Hr'g Tr. at 58:13-15 (Mr.
Heppt: "But I don't think, and I don't think that the record is clear at all as to how many accounts fell into [the
category of accounts S.W. Bach developed at its expense and allowed a broker to service.]").)  The record does not
directly contradict these representations.  (*Compare* Heppt. Decl. in Opp. of Pl.'s Mot. for Partial Summ. J. (ECF #
122) ("Heppt Decl."), Ex. F (Gordon Depo.) at 136:19-137:14 ("A. I was made aware that Andrew Garrett was
looking to recruit those brokers.  He had an interest in recruiting several officers of these brokers, as other firms did
as well, and accounts, brokers started moving to other firms, several firms that didn't clear through us, and they
started moving in that direction, and then Andrew Garrett was inquiring as to how the accounts for the brokers that
they were working with could be transferred to them.  Q. And so did any accounts transfer over to Andrew Garrett
when the broker previously servicing the accounts did not go over to Andrew Garrett?  A. I don't know.  Q. And is
possible that some did?  A. Could be.  I don't know exactly how it worked."), Heppt. Decl. Ex. H (Feb. 15, 2007 E-
mail from Andrew Sycoff to Wayne Freeman) ("Nonetheless, if as Scott stated, that he'll be out of business shortly
anyway, I would expect that we will garner some of their brokers *and/or* accounts in the process, but that will
probably occur in the normal course of business.") (emphasis added), Flores Decl. (Apr. 30, 2010) (ECF # 116)
("Flores Decl."), Ex. 2 (Feb. 26, 2007 E-mail from Andrew Sycoff to Wayne Freeman) ("S.W. Bach filed a Form
BD-W on Friday and . . . their accounts have been transferred over to us from RBC Dain and . . . many of their
brokers have, at least, temporarily decided to go with us."), Flores Decl. Ex. 6 (Shapiro Decl. at ¶ 6) ("I knew that
upon filing the Form BDW, substantially all of S.W. Bach's customer accounts (the 'Accounts') would be
transferred to Andrew Garrett (the 'Transfer')"), Flores Decl. Ex. 12 (Conversion Update, Business Development
Meeting, 03/12/07) ("SW Bach notified us on 2/23 that the firm was filing BDW and directed us to transfer all
accounts and assets to Andrew Garrett"), *and* Flores Decl. Ex. 13 (April 3, 2007 E-mail from Guy Clemente) ("The
customer accounts of S.W. Bach were transferred to Andrew Garrett, Inc.  To be honest, had I made a decision to
leave S.W. Bach voluntarily, Andrew Garrett would not have been on my short list of firms."), *with* Heppt. Decl. Ex.
E (Sycoff Depo.) at 134:23-24 ("A. [W]e were providing a home for the brokers.").)  As discussed *infra* in Section
II(B)(3)(c), the Court need not determine at this juncture the quantity of Accounts that were transferred to AGI that
were either (1) orphaned of their original S.W. Bach broker when they were transferred or (2) developed by S.W.
Bach and not the individual S.W. Bach broker while at S.W. Bach, as those determinations affect damages and not
AGI's liability.

affected by the transfer of the Accounts to AGI that their Accounts were "transferred" to AGI

through a "negative consent" procedure.[3]  (Trustee Stmt. at ¶¶ 25-26.)  The letter implementing

the "negative consent" procedure provided that "[a]s of the close of business February 23, 2007,

the responsibility for introducing your account to RBC Dain CS and for transmitting your orders

and instructions to RBC Dain CS regarding your cash balances and security positions carried by

that firm has transferred from S.W. Bach & Co. to Andrew Garrett, Inc.  If for any reason you

would not like this responsibility transferred to Andrew Garrett, Inc., please notify us . . . before

March 23, 2007 . . . ."  (*See id*. at ¶ 26.)

On April 24, 2007, sixty days after S.W. Bach filed the Form BDW, its registration in

NASD terminated.  (*Id*. at ¶ 33.)  However, following the transfer of the Accounts, the Financial

Industry Regulatory Authority ("FINRA"), into which NASD was consolidated in July 2007,

launched a special investigation inquiring whether "any payment or other consideration was

made by [AGI] and/or its CEO and owner, [Sycoff] to [Shapiro], former President, CEO and

shareholder of former member, [SW Bach] for the transfer of customer accounts from SW Bach

to Andrew Garrett," during which they found no such payments.  (*See id.* at ¶¶ 34-35.)  Notably,

during the course of the FINRA investigation, AGI did not disclose to FINRA that prior to

February 23, 2007 AGI (i) purchased the new computers and office space in order to service

S.W. Bach customer accounts; (ii) incurred expenses in anticipation of acquiring the Accounts;

(iii) discussed the Accounts with Shapiro as early as October 2006 and (iv) knew Shapiro was

going to file the Form BDW prior to its filing.  (*Id*. at ¶ 36.)

---

[3]    The so-called negative consent procedure authorized by FINRA permits a "bulk transfer" of numerous accounts
from one broker-dealer to another, with the customers then advised by letter that they can transfer the accounts to
any other firm of their choice.  The negative consent procedure is discussed below, *see infra* at Section
II(B)(3)(b)(iv) n.12.

S.W. Bach earned a total of approximately $57.7 million in gross commissions from the

Accounts from 2004 through the period ending February 28, 2007.  (*Id.* at ¶¶ 37-39, 41.)  From

the time the Accounts were transferred until August 2008, AGI earned gross revenue of no less

than $1.5 million "generated by the customer accounts that originally had been at S W Back

[*sic*]."  (*See id.* at ¶¶ 45.)  Following the transfer of the Accounts, AGI neither employed Shapiro

nor made the promised payments to Shapiro, nor has AGI ever paid consideration to the Debtor

for the transfer of the Accounts.  *(Id.* at ¶¶ 42-43.)

### B.    Procedural History

On May 22, 2007, creditors of the Debtor filed an involuntary petition for relief against

the Debtor in this Court under chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*.  (ECF

# 1.)  The Court entered an order for relief on June 29, 2007 and Togut was appointed as the

Trustee.  (ECF # 8.)

The Trustee commenced an adversary proceeding against AGI, RBC Dain, Shapiro and

JAS Management on June 15, 2009.[4]  (Trustee Stmt. at ¶ 5, 7.)  The Trustee asserted five claims

against AGI, including the constructive fraudulent conveyance claim in Count Nine, as well as

claims for aiding and abetting Shapiro's alleged breach of fiduciary duties ("Count Eight"),

restitution and unjust enrichment against AGI ("Count Ten"), disallowance of bankruptcy claims

filed under 11 U.S.C. § 502(d) ("Count Seventeen") and equitable subordination/disallowance

under 11 U.S.C. § 510(c) ("Count Eighteen").  AGI answered the Complaint on August 14,

2009, asserting four affirmative defenses in its Answer (ECF #14) to all claims including Count

Nine, arguing: (1) the litigation is not properly maintained under applicable and controlling

---

[4]      The Court has since stricken the Answer of JAS Management and entered a default judgment against it.
(ECF # 91.)  The RBC Dain entities settled the Trustee's claims against them.  (ECF # 112.)

industry rules; (2) AGI agreed to accept the transfer of the Accounts as part of the regulatory

scheme, including SEC Rule 15c3-1, the "Net Capital Rule," and Rule 15c3-3, the "Customer

Protection Rule," designed to protect customers of brokerage firms that cease operations due to

financial insolvency; (3) once the Debtor tendered its license to the NASD, it was prohibited

from managing the Accounts as a matter of law and, therefore, the right to manage those

Accounts was no longer an asset of the firm; and (4) the Trustee's damages, if any, were caused

by the actions of individuals or entities over whom AGI exerted no control and for whom it bears

no responsibility.  (AGI Answer, at 33-34.) (ECF # 14.)

The Court previously referred the aiding and abetting breach of fiduciary duties,

restitution and unjust enrichment claims (Counts Eight and Ten) to arbitration, but stayed the

arbitration of those claims pending this Court's resolution of Count Nine.  *See Togut v. RBC

Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 425 B.R. 78, 104 (Bankr. S.D.N.Y. 2010)

("Arbitration Decision").  As the Court noted in the Arbitration Decision, the disallowance and

equitable subordination claims (Counts Seventeen and Eighteen), which the Trustee asserted

against all Defendants, including AGI, can only be asserted against creditors who file proofs of

claim against the Debtor, which AGI has not done.  *See id.* at 84 n.5.  However, the Court will

not dispose of these claims absent a motion from AGI.

The Trustee now seeks partial summary judgment only as to Count Nine.  Specifically,

the Trustee alleges that the Debtor transferred customer information and the valuable right to

earn fees from its customer accounts within two years of the Petition Date, for AGI's benefit, for

no consideration, constituting a fraudulent conveyance under section 548 of the Bankruptcy

Code.  (*See* Trustee Stmt. at ¶ 6.)  AGI does not deny that the Debtor was (i) insolvent on the

date the accounts were transferred, or became insolvent as a result of the transfer; and/or (ii)

engaged in business or a transaction for which any property remaining with the Debtor was an unreasonably small capital at the time of, or a result of, the transfer of the accounts, nor that the Accounts were transferred without consideration.  (*See id.* at ¶¶ 3-4.) AGI argues that the Debtor had "no cognizable property interest in the customer accounts that were transferred to AGI." (Mem. Of Law of Def. AGI In Opp'n. to Trustee's Mot. for Partial Summ. J.  (ECF # 121) ("AGI Mem.") at 7.)  It seeks denial of the Trustee's motion for summary judgment and dismissal of Count Nine as a matter of law.  (*Id.*.)

For the reasons explained below, the Court finds that the Accounts constitute an "interest of the debtor in property" under 11 U.S.C. § 548(a)(1)(B) and grants the Trustee's motion for partial summary judgment as to AGI's liability.

## II.    DISCUSSION

AGI does not dispute that the "right to manage the Accounts was a valuable right, and an asset of the Debtor, at least until February 23, 2007." (*See* Trustee Stmt. at ¶ 40.)  In determining whether the Accounts constitute an "interest of the debtor in property" under 11 U.S.C. § 548(a)(1)(B), the Court need only focus on whether the Accounts were assets of the Debtor at the time they were transferred to AGI.

### A.  Summary Judgment is Appropriate

A court should only grant summary judgment under FED. R. CIV. P. 56, made applicable in bankruptcy proceedings under FED. R BANKR. P. 7056, where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting FED. R. CIV. P. 56(c)) (internal quotation marks omitted).  Issues of non-material fact, however, will not prevent a court from awarding a party summary judgment. *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").  Facts are material if they "might affect the outcome of the suit under the governing law." *Overton v. N.Y. State Div. of Military and Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004) (quoting *Anderson,* 477 U.S. at 248) (internal quotation marks omitted).

On a motion for summary judgment the movant bears an initial burden to forward evidence that satisfies "each material element of his claim or defense, demonstrating that he is entitled to relief." *Isaac v. City of N.Y.*, --- F. Supp. 2d ----, 2010 WL 1223090, at *4 (S.D.N.Y. Mar. 22, 2010).  The non-movant needs to demonstrate more than some "metaphysical doubt" as

to the material facts, and come forward with "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (internal citations omitted). *See also Scott v. Harris*, 550 U.S. 372, 380 (2007). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson*, 477 U.S. at 248, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Id.* at 255. If the nonmoving party is unable to provide evidence of a genuine issue of material fact, "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).[5] FED. R. CIV. P. 56(d)(2) provides that "[a]n interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages."

Here, as explained further below, there are no genuine issues as to any material fact with respect to AGI's liability for the fraudulent conveyance claim. The few facts on which the Trustee and AGI disagree are not material to the instant motion, though they may be relevant at the damages stage. Instead, the outcome of this Motion for summary judgment on liability depends on the character of the transfer of the Accounts, the facts (as opposed to the implications) of which neither side challenges in any way material to a determination of liability. The Trustee has met his initial burden to forward evidence that satisfies "each material element

---

[5]     If the party resisting the motion cannot present facts essential to justify its opposition, it may request additional discovery under FED. R. CIV. P. 56(f). The party must file an affidavit explaining: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *See Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir. 1989) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir. 1985)); *accord Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994). "The failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Di Benedetto v. Pan Am World Serv., Inc.*, 359 F.3d 627, 630 (2d Cir. 2004) (quoting *Paddington Partners*, 34 F.3d at 1137) (internal quotation marks omitted). Here, AGI does not request any further discovery. Furthermore, the Court has made clear that the discovery deadlines have expired and will not be extended further. *See RFA Decision, 2010 WL 681000, at *7 ("No additional depositions or written discovery requests may be served by either party.").

of" a section 548 fraudulent conveyance claim, and AGI has failed to provide evidence of any

genuine issue of fact. Therefore, partial summary judgment under FED. R. CIV. P. 56(d)(2) is

appropriate as to AGI's liability for the fraudulent transfer.

### B. The Transfer is Avoidable Pursuant to 11 U.S.C. § 548(a)(1)(B)

#### 1. The Purpose of 11 U.S.C. § 548(a)(1)(B)

Section 548(a)(1)(B) of the Bankruptcy Code permits a trustee to avoid, *inter alia*, "any

transfer . . . of an interest of the debtor in property . . . that was made within 2 years before the

date of the filing of the petition, if the debtor voluntarily or involuntarily–(B)(i) received less

than a reasonably equivalent value in exchange for such transfer . . . ; and (ii) (I) was insolvent

on the date that such transfer was made . . . or became insolvent as a result of such transfer or

obligation; [or] (II) was engaged in business or a transaction, or was about to engage in business

or a transaction, for which any property remaining with the debtor was an unreasonably small

capital." 11 U.S.C. § 548(a)(1)(B). Subparagraph 548(a)(1)(B) protects against "constructive"

fraudulent transfers, whereas subparagraph 548(a)(1)(A) requires a showing of actual fraudulent

intent. *See* 5 COLLIER ON BANKRUPTCY ¶ 548.05 (16th ed. rev. 2010). The burden is on the

movant to demonstrate the elements of a constructive fraudulent transfer claim by a

preponderance of the evidence. *E.g.*, *Savage & Assocs., P.C. v. Mandel (In re Teligent Inc.)*, 380

B.R. 324, 332 (Bankr. S.D.N.Y. 2008); *Statutory Comm. of Unsecured Creditors v. Motorola,*

*Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 342 (Bankr. S.D.N.Y. 2007); *Kittay v. Flutie*

*New York Corp. (In re Flutie New York Corp.)*, 310 B.R. 31, 52 (Bankr. S.D.N.Y. 2004).

"[F]raudulent transfer law allows creditors to avoid transactions which unfairly or

improperly deplete a debtor's assets or that unfairly or improperly dilute the claims against those

assets." 5 COLLIER ON BANKRUPTCY ¶ 548.01. It "aims 'to make available to creditors those

assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away.'" *In re PWS Holding Corp.*, 303 F.3d 308, 313 (3d Cir. 2002) (citing *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000)). Along the same lines, "section 548 reaches transactions which are not frauds"; instead, "[a]ny transaction made by a financially impaired debtor for less than an even exchange of value is vulnerable." 5 COLLIER ON BANKRUPTCY ¶ 548.01. Still, the fraudulent transfer statute is

> not intended to insure that creditors will never be deprived of a valuable asset. The deprivations [this statute is] designed and intended to prevent are those that are the result of an intentional fraud or a constructive fraud resulting from a wrongful or unwarranted participation on the part of the Debtor, whether by omission or commission. Therefore, not every prepetition transaction or occurrence which may technically be a transfer under Section 101(54) [of the Bankruptcy Code] and which results in a debtor being deprived of an asset while it is insolvent or undercapitalized and for which it receives no consideration or less than a fair consideration [such as when a debtor admittedly defaults under a contract prepetition resulting in the termination of that contract] is necessarily avoidable as a fraudulent transfer.

*Metro Water and Coffee Serv., Inc. v. Rochester Cmty. Baseball, Inc. (In re Metro Water and Coffee Serv. Inc.)*, 157 B.R. 742, 747 (W.D.N.Y. 1993) ("*Metro*").

**2. AGI's Admissions Satisfy All Elements of a Section 548(a)(1)(B) Claim With the Exception of Whether the Accounts Constituted "Interest[s] of the Debtor in Property" When The Debtor Transferred Them to AGI**

Here, AGI admits that the Accounts were transferred within two years of the Petition Date and the Debtor was insolvent on the date of the transfer, or became insolvent due to the transfer, and/or was engaged in business or a transaction for which any property remaining with the Debtor was an unreasonably small capital at the time of, or as a result of, the transfer. (*See* Trustee Stmt. at ¶¶ 3-4.)

AGI also admits it never paid any consideration to the Debtor in exchange for the Accounts, and it does not dispute that a broker-dealer's right to manage accounts is customarily sold. (*Id.* at ¶¶ 1, 43, 46.) The Trustee rightfully points out that a lack of any consideration implies that there is no material issue of fact concerning whether the Debtor received "less than reasonably equivalent value" under section 548(a)(1)(B) in exchange for the Accounts. (*See* Trustee Mem. of Law In Supp. of His Mot. for Partial Summ. J. against AGI at 11) (ECF # 116) ("Trustee Mem.")). For example, in *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 421 (Bankr. S.D.N.Y. 2007), the court determined that "[s]ince no 'value' was received, the Debtor could not have received 'reasonably equivalent value.'" *See also Devon Mobile Commc'ns Corp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, No. 02-41729 (CGM), 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006) ("In determining value, the Court makes a two fold inquiry: whether the debtor received any value at all in exchange for the transfer, i.e. any realizable commercial value as a result of the transaction, and whether that value was in fact reasonably equivalent . . . ."); *Mellon Bank v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 149 (3d Cir. 1996) ("[B]efore

determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court

must make an express factual determination as to whether the debtor received any value at all.").

Therefore, the only issue before the Court is whether the Accounts were "interest(s) of

the debtor in property" under section 548(a)(1)(B) of the Bankruptcy Code when they were

provided to AGI.  (*See also* Hr'g Tr. at 6:14-24 ("The Court: [B]oth sides agreed that the only

issue on the constructive fraudulent conveyance claim is whether the accounts were property of

the estate.  Am I right?  Mr. Flores: At the time of the transfer, Your Honor, yes."); AGI Mem. at

1 ("The sole question presented by the Trustee's motion for partial summary judgment is

whether the Debtor had any cognizable interest in the property that was transferred . . . .").)

### 3. The Right to Manage the Accounts Was an "Interest of the Debtor in Property" When The Accounts Were Transferred to AGI

#### a.  *"Transfer" of "An Interest in Property" Under the Code*

"Transfer" under section 101(54) of the Bankruptcy Code applies to, *inter alia*, "(D) each

mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or

parting with – (i) property; (ii) or an interest in property."  Under this broad provision, "any

transfer of an interest in property is a transfer, including a transfer of possession, custody or

control, even if there is no transfer of title, because possession, custody, and control are interests

in property."  5 COLLIER ON BANKRUPTCY ¶ 548.02 (citing Analysis of H.R. 8200, H.R. REP. NO.

595, 95th Cong., 1st Sess. 314 (1977), *reprinted in* App. Pt. 4(d)(i); *Black & White Cattle Co. v.

Granada Cattle Servs., Inc., (In re Black & White Cattle Co.*), 783 F.2d 1454, 1462 (9th Cir.

1986) (Bankruptcy Code's definition of transfer "expressly encompasses transfers of an interest

in property as distinct from transfers of the property itself."))

This comports with section 541(a)(1) of the Bankruptcy Code's broad definition of

"[p]roperty of the estate" as "all legal and equitable interests of the debtor in property." 11

U.S.C. § 541(a)(1).  *See also Brown v. Dellinger (In re Brown)*, 734 F.2d 119, 123 (2d Cir. 1984)

("'all legal or equitable interests of the debtor in property' has been given the broadest possible

interpretation").  "The legislative history . . . indicates that the Code § 541(a)(1) 'will bring

everything of value that the debtor has into the estate.'"  4 NORTON ON BANKRUPTCY § 61:1 (3d.

ed. 2010) (citing H.R. REP. 95-595, 95th Cong., 1st Sess. 176 (1977)).

An interest of a debtor is property of the estate despite any "provisions in an agreement,

transfer instrument, or applicable nonbankruptcy law–(A) that restricts or conditions transfer of

such interest by the debtor," with some exceptions not relevant here.  *See* 11 U.S.C. § 541(c).

*See also Official Comm. of Unsecured Creditors v. PSS S.S. Co., Inc. (In re Prudential Lines,

Inc.)*, 928 F.2d 565, 572 (2d Cir. 1991) ("In short, interests whose value is speculative and

interests that involve intangible rights that are subject to regulation may be included as property

of the estate."); *Matto's, Inc. v. Olde Colonie Place (Matter of Matto's, Inc.)*, 9 B.R. 89, 90-92

(Bankr. D. Mich. 1981) (liquor license is property of the estate despite opponent's argument that

it is in "the nature of a permit and that the holder of such license merely has a privilege to carry

on business subject to the will of the grantor").

Whether there is an interest in property is question of state or other non-bankruptcy law

unless a federal interest calls for a different result.  *Butner v. United States*, 440 U.S. 48, 55

(1979); *see also In re Mueller*, 256 B.R. 445, 455 (Bankr. D. Md. 2000) ("Applicable

nonbankruptcy law is any law–State or Federal, aside from the Bankruptcy Code–that would

prevent ordinary creditors of the debtor from reaching the asset.").

"Although property of the estate for purposes of § 541 has been interpreted broadly, the

concept is not without limits."  *In re Lawton*, 261 B.R. 774, 777 (Bankr. M.D. Fla. 2001).  "The

trustee can assert no greater rights than the debtor had on the date the case was commenced."  5

COLLIER ON BANKRUPTCY ¶ 541.03.  Thus, property over which the debtor is merely exercising some "power . . . solely for the benefit of an entity other than the debtor" is not property of the estate.  11 U.S.C. § 541(b)(1).  *See also Owner-Operator Indep. Drivers Assoc., Inc. v. Huntington Nat'l Bank (In re Intrenet, Inc.)*, 273 B.R. 153, 157 (Bankr. S.D. Ohio 2002).  Nor is property held in trust, escrow, or as part of bailment part of the estate.  *See Golden v. The Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 102 (Bankr. D. Del. 2006)*; Interchange Bank v. Warde Elec. Contracting, Inc. (In re Warde Elec. Contracting, Inc.)*, 308 B.R. 659, 664 (S.D.N.Y. 2004); *see also In re Intrenet, Inc.*, 273 B.R. at 158.

AGI argues that prepetition forfeiture divests a debtor of any interest in property.  (*See* AGI Mem. at 9) (citing *Thaler v. Cnty. Of Nassau Dist. Attorney (In re Wolfson)*, 261 B.R. 369, 374 (Bankr. E.D.N.Y. 2001) (court forfeiture order resulting from criminal proceeding divests estate of interest in property on date order is signed (not on date funds attached) and debtor cannot assert interest in forfeited property in subsequent bankruptcy proceeding)).  AGI fails to point out, however, that in *In re Wolfson* the forfeiture was court-ordered, and courts otherwise explicitly discourage a debtor's prepetition voluntary forfeiture of valuable rights.  *See, e.g.*, *In re Seven Hills, Inc.*, 403 B.R. 327, 335 (Bankr. D.N.J. 2009) ("A court of equity abhors forfeitures, and will not lend its aid to enforce them.") (lease provision context) (quoting *Jones v. N.Y. Guaranty and Indemnity Co.,* 101 U.S. 622, 628 (1879)).

Here, as explained below, upon the filing of the Form BDW, the Debtor merely requested permission to withdraw its registration as a broker-dealer, which would not become effective for sixty days, and the request could be withdrawn.  Thus, the Debtor was not irrevocably prohibited from engaging in "securities activities" once the Form BDW was filed.  Nothing in the Security and Exchange Commission ("SEC")'s rules and regulations or the Form BDW itself indicates

that the transfer of the Accounts would not be permitted after the Form BDW was filed, when the

Accounts would have significant value in any hands but the Debtor's.  The Accounts, as opposed

to the customer assets contained in those accounts, were not held in escrow or trust by S.W. Bach

when they were transferred to AGI.[6]

> b.  *The Accounts Were "Interest[s] of the Debtor in Property" at the time of its
>     transfer after the Filing of the Form BDW*

AGI does not dispute that the Accounts constituted a "valuable interest in property" prior

to the BDW filing.  (Trustee Stmt. at ¶ 40.)  Furthermore, AGI does not dispute that the right to

manage accounts is customarily bought and sold.  (*Id*. at ¶ 46.)  However, AGI argues that upon

the S.W. Bach's filing of the Form BDW, it ceased to have any property rights in the Accounts.

(AGI Mem. at 9) ("[P]ursuant to the Federal law and regulations governing the registration of

broker dealers, whatever interest S.W. Bach had in the customer accounts that were transferred

to AGI was terminated when it filed its Form BDW on February 23, 2007.  By that filing, S.W.

Bach essentially forfeited its right to derive income from the customer accounts and cannot now

assert an interest in that forfeited property.").  The Court disagrees.

As explained further below, S.W. Bach still had an interest in the Accounts from

February 23, 2007, when at least some of the Accounts were transferred, until (and after) March

---

[6]    In fact, the actual securities and customer assets in the customer accounts were held by RBC Dain as
clearing broker since S.W. Bach was merely an introducing broker.  (*See* Hr'g Tr. at 52: 10-11 (Mr. Heppt: "The
securities and the cash were held by RBC Dain."); Daphne Abrams, Note, *A Second Look at Clearing Firm
Liability*, 67 Brook. L. Rev. 479, 484 (2001) ("Small brokerage firms, commonly referred to as introducing firms,
typically lack sufficient capital, back office technology and personnel to 'self-clear.'  As a result, they enter into
'carrying agreements' with clearing firms to outsource clearing and other services. . . . [a] clearing firm *clears*
trades, i.e., completes transactions by delivering securities to the purchasing broker-dealer and by making money
payments to the selling broker-dealer.  Clearing responsibilities include:  . . . safeguarding the funds in the
customer's account.") (emphasis in original) (internal quotation marks and footnotes omitted).

2, 2007, when AGI alleges the transfer of the Accounts was completed.[7]  S.W. Bach maintained

this interest despite its filing of the Form BDW, which did not become effective for sixty days,

and which S.W. Bach could have withdrawn (subject to some limitations) within the sixty day

period.

Furthermore, there is nothing in the SEC rules and regulations or the Form BDW itself

that would explicitly prohibit a transfer of the right to manage accounts after or contemporaneous

with the filing of a Form BDW.  While S.W. Bach could not trade securities after filing the Form

BDW, it could take steps to wind up its business affairs.  The right to manage the accounts was a

"wasting asset," since only a registered broker-dealer could actively manage the accounts.

Therefore, if S.W. Bach was going to receive value for transferring the Accounts, the transfer

had to be accomplished quickly.  Shapiro assured that the Accounts would be transferred

quickly, but he did so without S.W. Bach being compensated for the transfer.  S.W. Bach's

brokers were free to join other firms, and their account relationships were free to follow them,

but that does not alter the fact that the right to manage the accounts was transferred by S.W.

Bach to AGI.  Whether specific accounts followed their brokers to AGI, or were transferred to

---

[7]       With respect to whether the "transfer" began prior to the filing of the Form BDW, as the Trustee alleges,
the Court determines that there are disputed issues of fact precluding the Court from making that decision on a
motion for summary judgment.  Furthermore, the Court cannot at this time determine whether the filing of the Form
BDW itself constituted a "transfer" of the right to manage the Accounts because of disputed issues of fact.
According to AGI, Shapiro filed the Form BDW because he "could not take the pressure any longer," his
compliance department was gone, and he was unable to hire new people and thus "AGI wanted to be able to recruit
as many S.W. Bach brokers as possible," implying that the Form BDW was merely an impetus for AGI to seek the
right to manage the customer accounts, but the transfer of the right to manage the accounts did not actually begin
until after, or contemporaneously with, the filing of the Form BDW.  (*See* AGI Mem. at 4-5; Heppt. Decl. Ex. D; Ex.
A at 60:16-25; 61:2-25; 62:2-25; 63:2-7.)  However, in light of the Court's ruling that the Accounts continued to be
valuable rights of S.W. Bach after the filing of the Form BDW, the Court finds it unnecessary to determine whether
the "transfer" began prior to the filing of the Form BDW, at the time of the Form BDW, or after the filing of the
Form BDW.  The Court also agrees with AGI that "[a]ny alleged promise to Shapiro" to compensate him is "not
relevant to the fraudulent conveyance claim" or the timing of the transfers.  (*See* AGI Mem. at 2.)  The weight of
those facts and any admissions on the part of AGI regarding them presumably will be adequately addressed and
considered in any FINRA arbitration of Counts Eight and Ten.

AGI and then shortly afterward were again transferred elsewhere, may affect the amount of

compensable damages, but it does not affect issues of liability.

> (i)  Under the Relevant Rules and Regulations, a Form BDW Presumes that Securities
> Activities Have Already Ceased But Does Not Become Effective For Sixty Days

Even if AGI correctly argues that the Transfer did not occur until after S.W. Bach filed its

Form BDW, S.W. Bach did not lose any property interest in the Accounts at the time it filed the

Form BDW.  AGI does not dispute that Shapiro authorized RBC Dain to transfer the Accounts at

the time of the filing of the Form BDW.  (Trustee's Stmt. at ¶¶ 22-24.)

The rules and regulations regarding broker withdrawal promulgated under 15 U.S.C. §

78, *et seq.* (2010) ("Securities Exchange Act of 1934") make it clear that a Form BDW is not

"effective" until sixty days after it is filed.  Under 15 U.S.C. § 78o(a)(1) and (b)(8), a broker-

dealer must register with the SEC and at least one self-regulatory organization prior to

conducting any business in the securities industry.  *See S.E.C. v. WACO Financial, Inc.*, 518 F.

Supp. 651, 652-53 (W.D. Mich. 1981) ("In order to engage in securities transactions, a

broker/dealer must be qualified and registered under the provisions of the Act and the regulations

promulgated thereunder.  Thereafter a broker-dealer can either be regulated directly by the SEC .

. . or join a self-regulating body such as one of the exchanges or the NASD.").  "The requirement

that brokers and dealers register is of the utmost importance in effecting the purposes of the Act.

It is through the registration requirement that some discipline may be exercised over those who

may engage in the securities business and by which necessary standards may be established with

respect to training, experience, and records."  *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391

F.2d 357, 362 (5th Cir. 1968).  Registration protects the investing public against unnecessary risk

and violations going forward as well as guards against ongoing injury by those engaging in

misconduct. *Blaise D'Antoni & Assocs., Inc. v. S.E.C.*, 290 F.2d 688, 689 (5th Cir. 1961) (no absolute right to withdraw application for registration).

Specifically, under 15 U.S.C. § 78o(b)(8), "[i]t [is] unlawful for any registered broker or dealer to effect any transaction in, or induce or attempt to induce the purchase or sale of, any security . . . , unless such broker or dealer is a member of a securities association registered pursuant to section 78o-3 of this title or effects transactions in securities solely on a national securities exchange of which it is a member."  Thus, once a broker-dealer is registered, it is, with exceptions not relevant here, subject to the requirements of industry self-regulating bodies. Broker-dealers such as S.W. Bach and AGI were previously members of NASD.  However, in July 2007, NASD was consolidated with the member regulation, enforcement and arbitration functions of the New York Stock Exchange ("NYSE") to form FINRA.  *See* ABOUT THE FIN. INDUS. REGULATORY AUTH., http://www.finra.org/AboutFINRA/index.htm (last visited Aug. 18, 2010).  AGI is currently a member of FINRA.

Withdrawal from broker-dealer registration is accomplished by "filing a written notice of withdrawal with the Commission" and is to be accomplished "upon such terms and conditions as the Commission deems necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78o(b)(5).  The Form BDW is the required written notice.  *See S.E.C. v. Midland Equity Corp.*, No. 73 Civ. 2617-CSH, 1977 WL 1039, at *3 (S.D.N.Y. Sept. 14, 1977) ("*Midland II*") (citing 17 C.F.R. § 240.15b6-1(b) (1976)).  However, "[i]f the Commission finds that any registered broker or dealer is no longer in existence or has ceased to do business as a broker or dealer, the Commission, by order, shall cancel the registration of such broker or dealer."  15 U.S.C. § 78o(b)(5).

Whether the broker-dealer is permitted to withdraw from registration after it files its

Form BDW is solely in the discretion of the SEC.  *See* 69 Am. Jur. 2d *Sec.* § 351 (2009) ("A

broker-dealer does not have a constitutional or statutory right to withdraw from registration, but

may seek permission to withdraw by filing a written notice of withdrawal on Form BDW.")

(internal citations omitted).  The instructions attached to the Form BDW provide that the form's

"principal purpose" is to permit the SEC to determine whether "it is in the public interest to

permit a broker-dealer to withdraw its registration," though it also serves to "advise certain self-

regulatory organizations and all of the states that [a broker-dealer] want[s] to withdraw from

registration."  17 C.F.R. § 249.501a (2010).  Item 4 of Form BDW questions when the broker-

dealer "ceased business" or "withdrew [its] registration request."  *Id*.  The broker-dealer must

certify that all the information contained in the Form BDW is "accurate, complete and current."

*Id*.

Requests made by a broker-dealer on the Form BDW are subject to a waiting period of at

least sixty days before becoming effective.  17 C.F.R. 240.15b6-1 (2010).  Rule 15b6-1 provides:

> A notice of withdrawal from registration filed by a broker or dealer
> pursuant to Section 15(b) of the Act ((15 U.S.C. 78o(b)) shall
> become effective for all matters . . . on the 60th day after the filing
> thereof with the Commission, within such longer period of time as
> to which such broker or dealer consents or which the Commission
> by order may determine as necessary or appropriate in the public
> interest or for the protection of investors, or within such shorter
> period of time as the Commission may determine.

*Id.  See also SEC v. Midland Equity Corp.*, No. 73 Civ. 2617, 1973 WL 450, at *1 (S.D.N.Y.

Dec. 6, 1973) ("*Midland I*").  In *Midland I*, 1973 WL 450, at *1, Judge Gagliardi rejected, *inter*

*alia*, the argument that a broker-dealer's "failure to comply with the provisions of the Securities

Investor Protection Act ('SIPA') placed it beyond the reach of the SEC's power of inspection."

Instead, "[i]n order to terminate registration a broker-dealer is required to file a formal notice of

withdrawal with the Commission; the form of such notice and the manner in which it must be filed are described in Rule 15b6-1." *Id.* The principal of the broker-dealer never filed the notice, even when an SEC compliance examiner offered to supply him copies of the form. *Id.* The court therefore enjoined the broker-dealer from preventing the SEC access to its records. *Id.* at *2. In the *Midland II* decision four years later, Judge Haight ruled that because the entity still had not filed a proper form for withdrawal, the sixty day period was not triggered and the principal of the entity still "remain[ed] a broker-dealer." *Midland II*, 1977 WL 1039, at *3.

> (ii) While a Broker-Dealer is Forbidden From Engaging in "Securities-Related" Activities Once a Form BDW is Filed, Nothing in the SEC Rules, Regulations, No Action Letters or the Form BDW Itself Prohibits A Broker-Dealer From Transferring the Accounts for Value

The language permitting the sixty day period to be extended or shortened by the SEC was added to Rule 15b6-1 in 1999. In Release No. 34-41356 announcing the adoption of the amended rule, the SEC explained that broker-dealers must cease all securities activities once a request for withdrawal is filed, but may "unwind [their] non-securities business operations before [the] Form BDW becomes effective":

> [T]he [SEC] determined that there may be circumstances in which it would be advisable to provide broker-dealers seeking to withdraw from registration greater flexibility in scheduling the termination of their business operations. While a broker-dealer must cease all securities activities when it files a request for withdrawal on Form BDW, it may need additional time to unwind its non-securities business operations before its Form BDW becomes effective.

Broker-Dealer Registration and Reporting, 64 Fed. Reg. 25144-01, 25145 (May 10, 1999).

AGI argues that "managing" a customer's account is a "securities activit[y]" and would be prohibited once the Form BDW is filed. *See S.E.C. v. Martino*, 255 F. Supp. 2d

23

268, 283 (S.D.N.Y. 2003) ("brokerage" activities include the receipt of transaction-based income, client advertising and holding client funds and securities) (citing *SEC v. Margolin*, No. 92 Civ. 6307 (PKL), 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992) (same)). Unregistered entities generally may not accept commissions from registered representatives. *See Wolff Juall Inv.,* SEC No-Action Letter, 2005 WL 5394659, at *1 (May 17, 2005).

Often, before filing the Form BDW, the broker-dealer has already transferred the right to manage its accounts to another broker-dealer. *See ONB Inv. Serv., Inc.*, SEC No-Action Letter, 2005 WL 3465706, at *1 (Dec. 6, 2005). In *ONB Inv. Serv., Inc.*, the broker-dealer filed a Form BDW with the SEC on December 2, 2005. *Id.* The broker-dealer represented that "it . . . ceased conducting a securities business" and "[e]ffective November 30, 2005, the Firm ceased operations and transferred all its business and customer accounts to INVEST Financial Corporation," without specifying whether the business and customer accounts had been transferred for value. *Id.* The SEC required the broker-dealer to continue to comply with filing requirements and file its audited financial statements as of December 31, 2005, on the condition that the Form BDW "becomes effective not later than sixty days after [its filing date]." *Id. See also JII Securities Incorporated*, SEC No Action Letter, 1986 WL 66849, at *1 (Apr. 23, 1986) ("JII transferred its few remaining customer accounts to Wetheim & Co. as of December 1, 1985 . . . . On March 27, 1986, JII filed a form BDW with the SEC, the NYSE and the NASD."). In another SEC No Action Letter, it was not clear whether the broker-dealer transferred its accounts before or after the filing of the Form BDW. *Stearns & Co. Inc.*, SEC No Action Letter, 1975 WL 10701, *1 (Mar. 21, 1975).

Other SEC No Action Letters explicitly reference pre-Form BDW transfers of the right to manage accounts for value.  *E.g.*, *LIT America, Inc.*, SEC No Action Letter, 1993 WL 120437 (Mar. 31, 1993) ("Subsequent to the asset sale, all customer accounts will be transferred to the [buyer], and [seller broker-dealer] will file a Form BDW in order to withdraw its registration as a broker-dealer."); *Riter, Pyne, Kendall & Hollister, Inc.*, SEC No Action Letter, 1973 WL 8166, *1 (Aug. 30, 1973) ("RPK&H will transfer all of its customer accounts . . . and all assets and liabilities related to such accounts . . . to E&H.  RPK&H will receive in return a subordinated debt instrument from E&H equal in principal amount to RPK&H's outstanding registered subordinated debentures and a limited partnership interest in E&H. . . . ")

At least one SEC No Action Letter, however, alludes to the fact that the rights to manage the accounts can be transferred for consideration following the filing of a Form BDW.  *Merit Fin. Corp.*, SEC No Action Letter, 1989 WL 246655, at *1 (Dec. 29, 1989) ("On November 8, 1989, MFC entered into an asset purchase agreement to sell substantially all of its assets to two prior employees.  Upon closing, MFC will file Form BDW *and all then* existing customer accounts will be transferred to the acquiring corporation.") (emphasis added).[8]  Thus, AGI could have purportedly "closed" on a sale prior to the filing of the Form BDW, but actually received the Accounts from the Debtor following the filing of the Form BDW.  Either way, the SEC does not appear to frown upon a post-BDW transfer of customer accounts to other brokerage houses.

---

[8]    Although it must construe all inferences in favor of the non-moving party, the Court does not find the assertion of AGI's purported expert, Leslie Seff, that "[i]n my 34 years of experience within the industry, I am not aware of any firm that filed a BDW receiving compensation for the broker/dealer who acquired the sales force (and the respective accounts that chose to follow)" convincing given other evidence that transfers of accounts can occur after a broker-dealer files a Form BDW, and a SIPA Trustee could sell the right to manage accounts.  (*See* Heppt. Decl., Ex. P (Decl. of Leslie Seff) at ¶ 14.)  Furthermore, Seff's testimony appears limited to Accounts handled by individual brokers, who may be free to have their accounts follow them to their new employers.

Nor does the filing of a Form BDW exempt a broker-dealer from complying with the requirements of SIPA; the broker-dealer is still considered a member of the Securities Investor Protection Corporation ("SIPC") with its attendant responsibilities. *See* 15 U.S.C. §78aaa-lll *et seq.* (2010). Specifically, SIPA created SIPC, a non-profit corporation composed of, with exceptions not relevant here, "all persons registered as brokers or dealers under section 78o(b) of this title" which provides protections for the customers of such brokers or dealers in the event of a liquidation. *See* 15 U.S.C. §78ccc(A)(2)(a). In *Sec. Investor Prot. Corp. v. Blinder, Robinson & Co.*, 962 F.2d 960, 964 n.8 (10th Cir. 1992), the court determined that a stockbroker was subject to a SIPA liquidation and still a member of SIPC despite its filing of a request to withdraw its registration:

> By regulation, [broker-dealer] remained a member of the SIPC even though it had filed with the SEC a withdrawal of its registration as a securities broker-dealer. Absent special action by the SEC [broker-dealer's] withdrawal from registration became effective on the 60th day after the withdrawal was filed and its withdrawal from the SIPC became effective six months later.

(internal citations omitted). At the hearing, the broker-dealer conceded "[o]ur client is a member of SIPC. Our client is–may well be as far as the SEC is concerned–have a license to sell securities." *Id.*

Thus, nothing in any SEC rules or regulations, or the No Action Letters interpreting them or in the Form BDW purports to deprive a broker-dealer of the right to transfer management of accounts in return for compensation, either before or after a Form BDW is filed. Instead, as at least the *Merit Fin. Corp.* No Action Letter, 1989 WL 246655, at *1, implies, compensation for such a transfer after, or contemporaneously with, a Form BDW filing is appropriate. S.W. Bach did not abandon or forfeit its customer accounts when it filed the Form BDW as AGI alleges;

instead, within the sixty day period following its filing of the Form BDW, it had a right to withdraw its request to terminate its registration and the termination was not effective for sixty days following the filing date.  Furthermore, the timing of the filing of the Form BDW here should not allow the parties to game the system and deprive S.W. Bach's creditors of the value of the right to manage the Accounts that were transferred to AGI without consideration.  AGI's argument that S.W. Bach suddenly lost the rights to the Accounts the minute the Form BDW was filed would result in a forfeiture of potentially valuable rights which the Trustee seeks to monetize for the benefit of creditors.  Such a serious forfeiture of valuable rights is not favored and should not be found absent clear language in applicable rules or regulations.

(iii) When a SIPC Trustee Takes Over, A SIPC Trustee Customarily Sells the Right
to Manage the Former Firm's Accounts

The Court also finds further support for its conclusion that S.W. Bach had an interest in

property in the right to manage the Accounts that it could sell even after filing the Form BDW

because a SIPA trustee can also sell the right to manage accounts for the benefit of a debtor's

creditors, even though SIPA would otherwise prohibit a debtor from engaging in broker-dealer

business activities once a trustee is appointed.[9]

A SIPA liquidation proceeding generally is "designed to accomplish the completion of

open transactions and the speedy return of most customer property."  *Blinder, Robinson & Co.,*

*Inc.*, 962. F.2d at 965 (quoting *Sec. Inv. Protection Corp. v. Barbour*, 421 U.S. 412, 415 (1975);

citing H.R. REP. NO. 1613, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.C.C.A.N. 5254,

5262 (noting SIPA "establishes procedures for the prompt and orderly liquidation of SIPC

members when required")).  Prior to SIPA's enactment, "[c]ustomers of failed firms found their

cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings.  In

addition to its disastrous effects on customer assets and investor confidence, this situation also

---

[9]       On at least one occasion, the Trustee alleged that part of the reason for the transfer of Accounts to AGI was
to avoid a SIPC-directed liquidation.  (Compl. ¶ 29) (ECF # 1) ("By enabling the transfer of the Accounts to its
chosen successor, RBC Dain was able to:  . . . (iii) ensure that the Accounts (and/or securities in the Accounts) did
not fall under the control of [SIPC] or any other regulatory authority.").  This allegation was only relevant to the
Trustee's claim against RBC Dain, as clearing broker, because as noted *supra*, Section II B(3)(a) n. 6, RBC Dain as
the clearing broker physically held the customer assets and securities, and only RBC Dain, in the event it failed,
would be subject to a SIPA liquidation.  (*See also* Hr'g Tr. at 52: 2-11 ("Mr. Heppt: My understanding is that SIPC
would typically get involved where there's a liquidation or – for example, if the clearing broker, RBC Dain, was
going out of business or if another broker dealer that was actually holding customer funds or customer securities was
going out of business, SIPC will typically get involved in that case and those types of cases because the customers
are more at risk in that case than where an introducing broker like S.W. Bach goes out of business.  The securities
and the cash were held by RBC Dain.").)  While the accuracy of this assertion is not relevant to the current motion,
and in fact, all claims against RBC Dain have been settled, it is useful to examine what would have happened to the
Accounts had a SIPC-directed liquidation occurred, because as described further *infra* in Section II(B)(3)(iii), a
SIPA trustee would have been permitted to sell the right to manage accounts for value even after the subject broker-
dealer was forbidden from engaging in brokerage activities.

threatened a 'domino effect' involving otherwise solvent brokers that had substantial open transactions with firms that failed." *McKenny v. McGraw (In re Bell & Beckwith)*, 104 B.R. 842, 853 (Bankr. N.D. Ohio 1989) (quoting *Barbour*, 421 U.S. at 415).  Thus, "Congress enacted the SIPA to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers." *Id.* (quoting *Barbour*, 421 U.S. at 415).  *See also Sec. Inv. Protection Corp. v. BDO Seidman, LLP*, 49 F. Supp. 2d 644, 649 (S.D.N.Y. 1999) (citing *Barbour*, 421 U.S. at 415).  "Notwithstanding the special protection afforded customers, a SIPA liquidation proceeding is in essence a bankruptcy proceeding.  SIPA Section 78fff(b) provides that to the extent consistent with SIPA, the SIPA liquidation proceeding 'shall be conducted in accordance with chapters 1, 3, and 5, and subchapters I and II of chapter 7' of the Bankruptcy Code." *Camp v. Morey (In re Government Securities Corp.)*, 107 B.R. 1012, 1018 (S.D. Fla. 1989) (internal citation omitted).  *See also Sec. Inv. Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 133 (Bankr. S.D.N.Y. 2010) ("A SIPA liquidation is essentially a bankruptcy litigation tailored to achieve SIPA's objectives.").

SIPC generally establishes a procedure whereby account holders are elevated to a priority creditor status vis-à-vis other creditors of the broker-dealer by guaranteeing the return of securities or cash equivalents up to a certain value for each account.  *See Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006) ("The Act advances [the purpose of protecting investors from financial losses arising from the insolvency of their brokers] by according those claimants in a SIPA liquidation proceeding who qualify as 'customers' of the debtor priority over the distribution of 'customer property.'") (citing 15 U.S.C. §§ 78fff-2(b) & (c)(1), 78lll(4)).  Under SIPA, a court may "issues a protective decree," if, among other things,

the broker-dealer is "insolvent" as defined in the Bankruptcy Code, "unable to meet its

obligations as they mature" or "not in compliance with applicable requirements under the

[Securities Exchange Act of 1934]."  15 U.S.C. § 78eee(a)(3); (b)(1).  The court is then required

to appoint a "trustee for the liquidation of the business of the debtor" and remove the proceeding

to the bankruptcy court.  15 U.S.C. § 78eee(b)(3) and (4).  Once the SIPA trustee is appointed,

"[i]t [is] unlawful for any broker or dealer . . . to engage thereafter in business as a broker or

dealer, unless the Commission otherwise determines in the public interest."  15 U.S.C. § 78jjj.

Accordingly, the appointment of a SIPA Trustee has the same effect as the filing of a Form

BDW on "securities-related" activities.

  "To encourage the prompt resolution of customer claims, SIPC may advance funds to

brokerage customers or to an appointed trustee.  To the extent SIPC advances funds . . . it is

subrogated to customers' claims."  *BDO Seidman, LLP*, 49 F. Supp. 2d at 649 (internal citation

omitted).  "First, SIPC may assert its claim against the fund of customer property, and second,

SIPC may assert its claim against the general estate as an unsecured creditor (along with

customers not made whole by SIPC advances and distributions from the fund of customer

property)."  *Lopez v. Zaremba*, No. 3:08 CV 01132, 2009 WL 36617, at *4 (N.D. Ohio. 2009).

  Specifically, the SIPA trustee must distribute "customer property" as prescribed by SIPA.

"[C]ustomer property" is "cash and securities . . . at any time received, acquired, or held by or

for the account of a debtor from or for the securities accounts of a customer, and the proceeds of

any such property transferred by the debtor, including property unlawfully converted."  15

U.S.C. § 78lll(4).  "Customer property" is held on "account of customers," but does not consist

of assets traceable to specific customers.  *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 124

n.4.  *See also Peloro v. U.S.*, 488 F.3d 163, 174 (3d Cir. 2007).  Specifically, 15 U.S.C. § 78fff-

2(c)(1) provides that the trustee shall allocate customer property of the debtor:

> (A) first, to SIPC in repayment of advances made by SIPC
> pursuant to section 78fff-3(c)(1) of this title, to the extent such
> advances recovered securities which were apportioned to customer
> property pursuant to section 78fff(d) of this title;
>
> (B) second, to customers of such debtor, who shall share ratably in
> such customer property on the basis and to the extent of their
> respective net equities;
>
> (C) third, to SIPC as subrogee for the claims of customers;
>
> (D) fourth, to SIPC in repayment of advances made by SIPC
> pursuant to section 78fff-3(c)(2) of this title.
>
> Any customer property remaining after allocation in accordance
> with this paragraph shall become part of the general estate of the
> debtor.  To the extent customer property and SIPC advances
> pursuant to section 78fff-3(a) of this title are not sufficient to pay
> or otherwise satisfy in full the net equity claims of customers, such
> customers shall be entitled, to the extent only of their respective
> unsatisfied net equities, to participate in the general estate as
> unsecured creditors.  For purposes of allocating customer property
> under this paragraph, securities to be delivered in payment of net
> equity claims for securities of the same class and series of an issuer
> shall be valued as of the close of business on the filing date.

Where customer property is not sufficient to pay in full the claims of subparagraphs (A)

through (D) of paragraph (1), SIPA also permits a SIPA trustee to recover property "which,

except for such transfer, would have been customer property if and to the extent that such

transfer [was] voidable or void under the provisions of Title 11."  15 U.S.C. 78fff-2(c)(3).  While

providing that "[s]uch recovered property shall be treated as customer property," SIPA also

provides that "[f]or purposes of such recovery, the property so transferred shall be deemed to

have been the property of the debtor and, if such transfer was made to a customer or for his

benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding." *Id.*

SIPA "assumes that a customer—as an investor in securities—wishes to retain his investments despite the liquidation of the broker; the statute thus 'works to expose the customer to the same risks and rewards that would be enjoyed had there been no liquidation.'" *In re New Times Sec. Servs., Inc.*, 463 F.3d at 128 (quoting 6 COLLIER ON BANKRUPTCY ¶ 741.06[6]) (Alan N. Resnick & Henry J. Sommer eds. (15th ed. rev.); citing *In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 274 (Bankr. S.D.N.Y. 1996)). Importantly, section 78fff-2(f) of SIPA also provides that:

> In order to facilitate the prompt satisfaction of customer claims and the orderly liquidation of the debtor, the trustee may, pursuant to terms satisfactory to him and subject to the prior approval of SIPC, sell or otherwise transfer to another member of SIPC, *without consent of any customer*, all or any part of the account of a customer of the debtor. In connection with any such sale or transfer to another member of SIPC and subject to the prior approval of SIPC, the trustee may--
>
> (1) waive or modify the need to file a written statement of claim pursuant to subsection (a)(2) of this section; and
>
> (2) enter into such agreements as the trustee considers appropriate under the circumstances to indemnify any such member of SIPC against shortages of cash or securities in the customer accounts sold or transferred.
>
> The funds of SIPC may be made available to guarantee or secure any indemnification under paragraph (2). The prior approval of SIPC to such indemnification shall be conditioned, among such other standards as SIPC may determine, upon a determination by SIPC that the probable cost of any such indemnification can reasonably be expected not to exceed the cost to SIPC of proceeding under section 78fff-3(a) of this title and section 78fff-3(b) of this title.

(emphasis added).  As one commentator describes the process, the sale of the accounts requires

only the consent of SIPC, not the individual customers (or the broker previously serving the

individual accounts) because the statute is designed to facilitate a speedy transfer of accounts to

give the customer "prompt control" over his assets:

> The trustee's first step is to see whether it is possible for him to sell
> or otherwise transfer all or any part of a customer's account to
> another member of SIPC.  In effectuating the transfer the trustee
> requires the consent of SIPC but not that of the customer.  From
> the point of view of the customer, a transfer of his account enables
> him to trade and gives him prompt control over his assets, an
> advantage particularly in a falling market.  SIPC must consent,
> however, since the agreement to transfer may call for an
> indemnification of the transferee "against shortages of cash or
> securities in the customer accounts sold or transferred."  In giving
> its approval, SIPC will have to determine that "the probable cost of
> any indemnification can reasonably be expected not to exceed the
> cost to SIPC" of proceeding to calculate net equities and satisfy
> customer claims on an account-by-account basis.  The amount
> available as an advance to the trustee in relation to each customer
> account is $500,000, of which $100,000 can relate to cash claims
> made by a customer.  If it is found that the account does not
> include all the securities expected to be there, the trustee can
> purchase those specific securities prior to the sale or transfer of the
> account, provided such purchases can be effected in a fair and
> orderly market and the sum expended does not in the aggregate
> exceed the amount SIPC can advance on each account.

Egon Guttman, 28A MODERN SECURITIES TRANSFERS § 20:24 (3d ed. 2009)

(internal citations omitted).

The Court is aware of at least one instance in which a SIPC trustee received court

approval to sell the right to manage accounts and certain assets of a broker-dealer to another

broker dealer.  The terms of the deal largely followed the process described above.  Specifically,

in *Sec. Inv. Protection Corp. v. MJK Clearing, Inc.*, Case No. CV01-1779 RHK/JJM, Bankr.

Adv. Proc. No. 01-4257 RJK (Bankr. D. Minn., October 2, 2001) (ECF # 16), the bankruptcy

court approved a transfer agreement and a sale agreement between MJK Clearing, Inc. and

another entity (i) transferring MJK Clearing's brokerage accounts; and (ii) selling of all of MJK

Clearing's capital stock in its affiliate introducing firm to that entity.  According to the SIPA

trustee, the sale and transfer agreements resulted from "an effort to remedy the immediate crisis

[resulting from a failure to meet capital requirements] and prevent further harm to the [individual

account holders, other introducing firms, and the affiliate non-debtor introducing firm]" of the

debtor by "quickly market[ing] the assets of the [d]ebtor, while soliciting and accepting bids and

proposals for the transfer of the accounts controlled by the Debtor and the sale of the Debtor's

assets."  (Notice of and Mot. for Expedited Hr'g and Mot. for Order Approving Transfer of

Accounts of the Debtor and Sale of Shares of Stock of Miller Johnson Steichen Kinnard, Inc.

(October 1, 2001) ("Trustee Transfer Motion") (ECF # 10 at ¶ 16).)  The SIPA trustee averred

that "the consideration to be received under these two transactions exceed[ed] that available

under any other proposal."  (*Id.* at ¶ 21.)  The buyer paid $3.2 million to the debtor's estate under

the Stock Purchase Agreement.  (Am. Exs. To Trustee Transfer Motion (ECF # 18), Ex. B, at

1.)[10]

     In this case, as in a SIPA liquidation, the right to manage the Accounts could be sold after

S.W. Bach filed the Form BDW, despite the fact that neither S.W. Bach nor a broker-dealer in a

SIPA liquidation could engage in securities transactions or "business activities" of a broker-

---

[10]    In *In re Thomson McKinnon Securities Inc.*, 125 B.R. 88, 91 (Bankr. S.D.N.Y. 1991), the bankruptcy court permitted a chapter 11 debtor-in-possession to act as a SIPA trustee otherwise would have done by "authorizing it to segregate funds and securities [that it could not match with any firm or customer] sufficient to satisfy any potential customer claims, and to distribute funds and securities to former customers in satisfaction of customer claims on an ongoing basis."  The court remarked in dicta that "[p]rior to the filing date, in anticipation of its impending bankruptcy case, [broker-dealer] had ceased all brokerage activities, sold most of its assets and disposed of the vast majority of the customer property in its possession.  This included the transfer . . . of all of [broker-dealer's] active customer accounts to Prudential-Bache Securities, Inc. or, at the customers' instructions, to other brokers."  *Id.* at 90.  The court did not remark on whether the right to manage the accounts transferred to Prudential-Bache Securities, Inc. was sold or should have been sold.  In light of specific provisions of SIPA permitting the sale of the right to manage accounts and the broad definition of estate property, the Court determines that *In re Thomson McKinnon Securities Inc.* is not dispositive as to whether the Debtor has an interest in the Accounts.

dealer once the Form BDW was filed or the SIPA trustee was appointed. Therefore, the

Accounts were valuable interests in property of S.W. Bach regardless of when the Form BDW

was filed.

(iv) "Wasting Assets" Are Interests of the Debtor in Property

The Court recognizes that the value of the Accounts would quickly deplete if they were

not immediately transferred elsewhere once S.W. Bach filed the Form BDW, as the customers

would not be able to trade in the interim, and the Accounts were thus a "wasting asset." For

purposes of this Motion, the Court is not deciding the value of the Accounts when they were

transferred to AGI, as those determinations only affect damages, and not liability. Still, it is

worth noting that for purposes of evaluating whether a transfer of a "wasting asset" was for "less

than a reasonable equivalent value," courts look to the time the assets were transferred, not the

current value at the time the trustee or another party in interest asserts a fraudulent conveyance

claim. *See In re Da-Sota Elevator Co.*, 939 F.2d 654, 654 (8th Cir. 1991). In *In re Da-Sota*

*Elevator Co.*, the court determined that "certain elevator-maintenance contracts create[d] rights

sufficiently similar to property rights to be treated as assets of a bankrupt estate," and the

conveyance of those contracts was for "less than a reasonable equivalent value" and thus a

fraudulent conveyance. *Id.* The court rejected the recipients' of the conveyance contentions that

they "should be permitted to reassign the maintenance contracts to the plaintiff in partial

satisfaction of the money judgments against them" because:

> The maintenance contracts were sort of a 'wasting asset,'
> deteriorating in value as customers canceled their contracts with
> the debtor . . . and chose to transfer their business to defendants.
> Fairness to creditors requires collection by the trustee of the value
> of the contracts *at the time of transfer* to defendants, of which
> value defendants obtained the benefit and should reimburse the
> estate accordingly.

*Id.* at 655 n.2.  Here, if the Accounts were not transferred promptly after the Form BDW was

filed, the individual brokers would seek employment elsewhere and presumably take (or attempt

to take) their Accounts with them.  Fully aware that Shapiro was going to file the Form BDW,

AGI endeavored to offer departing brokers a "home," renting office space, purchasing computers

and flying its personnel to New York approximately 48 hours before the Debtor filed the Form

BDW.  (*See* Trustee Stmt. at ¶ 28-29; Heppt. Decl. Ex. E (Sycoff Depo.) at 134:23-24 ("A. [W]e

were providing a home for the brokers.").)  However, the day the Form BDW was filed or

shortly thereafter, AGI also took and became responsible for Accounts, including some which

were not accompanied by the brokers who had previously serviced the Accounts at S.W. Bach,

and at least some of which S.W. Bach, and not the individual broker, independently developed.

(*See* Hr'g Tr. at 49:1-5; 58:13-15; Section I(A) n.2, *supra*.)  While the customers had an

opportunity to cancel the transfer of their individual accounts to AGI through the "negative

consent" procedure on or before March 23, 2007, the Accounts undoubtedly had value to AGI

when it received them.[11]

---

[11]    The Court recognizes that ordinarily FINRA requires a firm to "give customers [affirmative] notice and obtain their consent before transferring their account(s)" in order to avoid violation of FINRA Rule 2010, which establishes Standards of Commercial Honor and Principles of Trade, because "[v]arious factors may affect an investor's decision to move an account to a new firm," and "when a firm initiates the transfer of a customer's account, there is no assurance that the customer has had sufficient time or information with which to decide whether the object to the transfer."  *See* MERGERS, ACQUISITIONS AND BUSINESS TRANSFERS, http://www.finra.org/Industry/Issues/Mergers/index.htm (last visited Aug. 18, 2010) ("Mergers"); NASD Notice to Members 02-57, *Bulk Transfer of Customer Accounts: Use of Negative Response Letters for the Bulk Transfer of Customer Accounts* (Sept. 2002), at 562, http://www.finra.org/ web/groups/ industry/@ip /@reg/@notice /documents/ notices/p003486.pdf .) ("Notice to Members 02-57").  However, as FINRA makes clear, a "negative consent" procedure may be used for bulk transfers of accounts when the transferor is financially distressed (to insure that the assets in the customer accounts are not "at risk because of the member's precarious financial condition"), in mergers and acquisitions of broker-dealers, or bulk transfers resulting from an introducing firm going out of business, an introducing firm changing its clearing firm, or a change in a networking arrangement with a financial institution. *See* Mergers; NASD Notice to Members 02-57 at 562-63.  This does not change the Court's determination that the Accounts had value when they were transferred to AGI even after the filing of the Form BDW.  The value of the Accounts transferred to AGI raises issues for damages, not liability.

      c.   *The Nature of the Accounts Transferred Only Raises Damages Issues Which The Court Does Not Need to Resolve at this Time*

The Court acknowledges that "there is a . . . longstanding dispute between some brokerage firms and their registered representatives about who 'owns' the customer relationship when a representative resigns from one firm to associate with another." *NEXT Financial Group, Inc.*, Initial Decision Release No. 349, Administrative Proceeding File No. 3-12738, 2008 WL 2444775, at *25 (ALJ June 18, 2008) (*made final* SEC Release No. 58192, 2008 WL 2783573 (July 18, 2008))("NEXT"). Much of the dispute is centered on whether the customer lists, information and related relationships are trade secrets of the brokerage firm, or whether they belong to the individual broker. In determining whether a trade secret exists, New York courts consider:

> (1) the extent to which the information is known outside of [firm's] business; (2) the extent to which it is known by employees and the others involved in the business; (3) the extent of measures taken by [firm] to guard the secrecy of the information; (4) the value of the information to [firm] and [its] competitors; (5) the amount of effort or money expended by [firm] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Cross Media Mktg. Co. v. Nixon (In re Cross Media Mktg. Corp.)*, No. 06 Civ. 4228(MBM), 2006 WL 2337177, at *4 (S.D.N.Y. Aug. 11, 2006) (lists of entity developed over the years and kept confidential determined to be trade secrets). *See also FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (customer information trade secrets because "[t]he record indicate[d] that it would be very difficult if not impossible for [competitor] to discover these . . . clients without [former employee's] help.")

Lists which contain more substantial information, such as customer preferences and pricing agreements, are often considered trade secrets because the information is more likely not readily ascertainable as opposed to mere customer leads. *Compare N. Atl. Instruments, Inc. v.*

*Haber*, 188 F.3d 38, 46 (2d Cir. 1999), *with Cross Media Mktg. Corp. v. CAB Mktg. (In re Cross*

*Media Mktg. Corp.)* , 367 B.R. 435, 453 n.24 (Bankr. S.D.N.Y. 2007) (Glenn, J.)  And absent

non-disclosure agreements or other non-compete protections, courts will often not conclude that

customer information is proprietary to the brokerage firm.  *Compare Morgan Stanley DW, Inc. v.*

*Frisby*, 163 F. Supp. 2d 1371, 1379 (N.D. Ga. 2001) (Under Georgia law, customer information

not trade secrets where the president of the brokerage firm's Consumer Markets Division

testified in a different proceeding that "it . . . flies in the face of the custom and practice of the

brokerage industry to suggest that when an account executive moves from one brokerage

concern to another he is not entitled to contact his former clients after he switches firms."), *with*

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Zimmerman*, No. 96-2412-JWL, 1996 WL

707107, at *2 (D. Kan. 1996) (enjoining broker from using customer information of his former

firm because "the defendant was unequivocally aware that the Documents were intended to be

confidential"), *and Merrill Lynch Pierce Fenner & Smith, Inc. v. Dolan*, 1990 WL 306478, at *1

(N.A.S.D. Feb. 14, 1990) (Bauman, McIntyre, Welch, Esq., Arbs.) (broker was liable for breach

of fiduciary duty and misappropriation of trade secret customer lists by secretly bringing over

information from over 435 accounts to his new employment at a competitor firm, which violated

an employee non-solicitation agreement).  Courts also consider whether an individual broker's

customers are loyal to that broker, or his firm.  *E.g.*, *Willis of New York, Inc. v. DeFelice*, 299

A.D.2d 240, 242 (N.Y. App. Div. 1st Dep't 2002) (no injunction for insurance broker "since the

record disclose[d] that many of [individual broker's] clients are loyal to him personally, and not

to the firm at which he works."); *Raymond James & Assocs., Inc. v. Leonard & Co.*, 411 F.

Supp. 2d 689, 692 (E.D. Mich. 2006) (no injunction where individual broker (1) developed many

of the plaintiff's firm's customer accounts and clients while previously employed at a different

brokerage firm where he had been keeping "posting pages," which "are industry standard and contain the client's personal information"; (2) "[plaintiff's] CEO told him and others . . . that they were free to take their book of business with them when they left [plaintiff]"; and (3) "[plaintiff broker-dealer] offered to buy his book of business for approximately $60,000.00 . . . .").

Furthermore, courts have recognized that customer lists may be bought and sold.  *See, e.g.*, *Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings, Inc.)*, 148 B.R. 194, 204 (Bankr. S.D.N.Y. 1992) ("Alert paid over $4 million for the right to contract exclusively with the customers whose names appeared on those lists."); *Arnold K. Davis & Co., Inc. v. Ludemann*, 160 A.D.2d 614, 614-15 (N.Y. App. Div. 1st Dep't 1990) (describing how plaintiff insurance broker purchased customer list from another insurance broker for $715,009.20, but denying injunction against proposed misappropriation of customer information by third broker because the claimant contacted customers on basis of his recollection, not any list).

Regardless of who "owns" the customer information, the SEC has certain protections for the migration of customer information from one brokerage firm to another which is directed at safeguarding the privacy rights of the customers as codified in Subtitle A of Title V of the Gramm-Leach Bliley Act (GLB Act), 15 U.S.C. §§ 6801-6809 (2010) and SEC Regulation S-P, 17 C.F.R. § 248 *et seq*.  The GLB Act "places the duty to protect the customer's financial privacy and to safeguard the customer's records and information on the covered financial institution, not the individual representative."  *NEXT,* 2008 WL 2444775, at *26.  Under Regulation S-P, "[t]he departing representative has no property right to a customer's nonpublic personal information" and thus, "[t]he longstanding dispute about whether the brokerage firm or

the registered representative 'owns' the customer relationship is irrelevant." *Id.* (citing NASD

Notice to Members 01-36 (June 2001); NASD IM-2110-7 (Dec. 21, 2001)).  Furthermore, as

acknowledged by ALJ Kelly in *NEXT*, several financial services firms are parties to a Protocol

for Broker Recruiting ("Protocol").  *NEXT*, 2008 WL 2444775, at *28; James L. Komie, Jin-Ho

Chung, "Securities Arbitration in the Market Meltdown Era: Achieving Fairness in Perception

and Reality The Protocol After Five Years", 1755 PLI/Corp 223, 225 (Aug. 12, 2007) ("Komie

Article").[12]  The Protocol "protects client privacy by limiting significantly the client information

the advisor can take with him or her and restricting the information's use by the advisor and the

hiring firm," which, in doing so "changes past practice in the industry, well-documented case

law, under which the advisor often took a wide variety of client information, including account

statements, holding pages and copies of client files."  Komie Article at 226 (internal citations

omitted).  The Protocol only permits a migrating broker to take "name, address, phone number,

e-mail address and account titles," but nothing else, including "account numbers, social security

numbers, account statements, cost-basis information, asset reports or any other information

relating to the client" or client files.  *Id.* at 228.  Restrictive covenants will "not prevent the

advisor from moving his or her clients pursuant to the Protocol."  *Id.* at 229.

    Notably, the jurisprudence and the Protocol appear to share two important carve-outs: (1)

a broker may not transmit individual customer information to his/her new brokerage firm prior to

resigning from his/her old brokerage firm, and (2) a broker may not bring customer information

for accounts which he/she did not personally service while employed at the former brokerage

---

[12]    There is an issue of fact whether the Debtor or AGI are or were ever signatories to the Protocol.  (*See* Hr'g
Tr. at 41:22 (Mr. Flores: "I do not know [if S.W. Bach is a party to the Protocol] . . . ."); 58:19-20 (Mr. Heppt: It's
my impression that [the Protocol] is not an industry standard.  . . . [t]here are a lot more than 250 firms operating in
the country.").)  However, as the extent of the Debtor's interest in the Accounts is appropriate only for the damages
phase, the Court need not decide this issue now.

firm. *See, e.g.*, *Frisby*, 163 F. Supp. 2d at 1380; *Sterne, Agee & Leach, Inc. v. Patrick*, Case No. 99-02859, 2000 WL 1807884, at * 3 (N.A.S.D. Oct. 11, 2000) (Lee, Gold, Allen, Arbs.); Komie Article at 229, 241 ("An advisor may not list or solicit clients serviced by other advisors in the branch office. . . .   An advisor will be 'deemed in compliance . . . so long as [he/she] . . . substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm will be taken with him or her.'"); *Hilliard v. Clark*, 1:07-cv-811 (PLM), 2007 WL 2589956, at *6 (W.D. Mich. Aug. 31, 2007) (While determining that the Protocol was not an industry standard, the court also enjoined non-brokers from taking [or] disclosing . . . confidential information about clients of [Plaintiff broker-dealer]," as "these individuals were not brokers and therefore could not allege the clients were theirs . . . ."); *Fin. Programs, Inc. v. Falcon Fin. Servs., Inc.*, 371 F. Supp. 770, 781 (D. Or. 1974) ("Defendants are hereby permanently enjoined from using, retaining, or copying all or any portion of [plaintiff's] customer lists . . . with the exception that defendants [individual brokers] are entitled to possession and reasonable use of those records which they were authorized to possess and use during their employment with [plaintiff] and which pertain solely to their own accounts.")[13]  The Court may consider the effect of these carve-outs on the Accounts at the damages trial.

---

[13]    The record is not clear whether S.W. Bach brokers had covenants not to compete or whether there were any "carve-outs" under certain "Association Agreements" which at least some S.W. Bach brokers may have signed upon joining AGI to allow the brokers to "take their accounts that they brought in from Bach and fellow employees that came in from Bach." (*See* Heppt. Decl. Ex. G (Schwartz Depo.) at 109:22-110:3; Hr'g Tr. at 33: 17-18 (Mr. Flores: "I actually believe they did [sign covenants not to compete at S.W. Bach], but that's not in the record . . . .  ")

### d. *"Strong Policy Reasons" Do Not Mitigate Against a Finding That the Transfer was Fraudulent*

AGI argues that "there are several very powerful public policy reasons for denying the Trustee's motion" including that (1) permitting the broker-dealer that filed a Form BDW to claim a property interest in customer accounts it serviced immediately prior to the filing during the 60 day period before its withdrawal became final would hamper the ability of unemployed brokers to switch jobs because potential employers would think they would be sued in bankruptcy court; (2) the customer accounts would be in limbo without access to investment advice or a full range of brokerage services, conflicting with the federal securities laws and the regulatory scheme in place to protect the investing public, which would conflict with the regulatory requirement that a broker-dealer "conduct itself with the high standards of commercial honor and just and equitable principles of trade required under FINRA Rule 2010 and would be a type of self dealing at the expense of the public customer."  (AGI Mem. at 16.)  Here, AGI and S.W. Bach negotiated for several months regarding the transfer of the Accounts, and AGI prepared for the Accounts prior to the filing of the Form BDW.  The Court does not find, however, that it was improper to transfer the Accounts to AGI, just that the transfer by S.W. Bach without consideration violated section 548 of the Bankruptcy Code.

AGI also contends that "[a] ruling that S.W. Bach maintained the right to sell its brokerage business after filing its BDW, would create regulatory (and possibly legal) issues for the filing [of the Form BDW], as the unemployed sales force seeks employment, but is hampered by the threat of suit that may accompany them to their next employer" and "subsequent to filing a BDW, S.W. Bach would be in violation of FINRA Rule 1122 [prohibiting members from providing incomplete or inaccurate information concerning membership or registration] if claiming to 'own' brokers or accounts," as "[w]hen S.W. Bach filed its Form BDW . . . it stated

that the firm ceased doing business as a broker dealer." (*Id*. at 17.)  The Court rejects these

contentions.  Just because the "business as a broker dealer" had no value to the Debtor does not

mean it had no value to other broker-dealers such as AGI, though admittedly it was a "wasting

asset."  The Court does not find that the Debtor had a property interest in the Accounts (or the

brokers) themselves, which admittedly consist of property held for the various customers, but

instead in a right to manage the Accounts.  Furthermore, a SIPA trustee is permitted to sell

accounts once the broker-dealer is no longer permitted to engage in securities' activity.  AGI

accepted these Accounts without consideration at its own risk, after months of discussions and at

least two days of intense preparation, and cannot game the system by asserting that the S.W.

Bach brokers made their way voluntarily to AGI in the "normal course of business."  (Heppt.

Decl. Ex. H (Feb. 15, 2007 E-mail from Andrew Sycoff to Wayne Freeman) ("Nonetheless, if as

Scott stated, that he'll be out of business shortly anyway, I would expect that we will garner

some of their brokers and/or accounts in the process, but that will probably occur in the normal

course of business."))

Nor does the Court accept AGI's argument that the Court's ruling will hamper newly-

unemployed brokers from obtaining new employment.  Individual brokers have long been

recognized to be able to switch jobs, with their existing customers moving their accounts to the

new employer's firm without the broker or his new employer risking liability.  Customers always

retain the ability to move their accounts.  The undisputed facts in this case do not raise such

issues.  Rather, S.W. Bach's then-president directed the transfer of S.W. Bach's accounts to AGI

without regard to the customers' wishes, or whether a particular broker was moving to AGI

notwithstanding the use of the "negative consent" procedure.  The freedom of movement of the

brokers, and, more importantly, the customers whose accounts they were servicing at S.W. Bach,

may reduce the value of the Accounts that were transferred to AGI.  That will be an issue for the

damages phase of this case.  It is not an issue for imposing liability on the undisputed factual

record in this case.

### III.    CONCLUSION

For the reasons explained above, the Trustee's motion for partial summary judgment as to

Count Nine of the Complaint is **GRANTED**.  The Court leaves damages to trial.  Arbitration of

Counts Eight and Ten against AGI remains **STAYED** pending the outcome in this Court with

respect to damages against AGI under Count Nine**.**  A separate order will be entered scheduling a

case management conference at which a trial date will be set.

**IT IS SO ORDERED**.

Dated:    New York, New York
          August 18, 2010

                                    /s/ **Martin Glenn**
                        _____
                        HONORABLE MARTIN GLENN
                        UNITED STATES BANKRUPTCY JUDGE